CARNIVAL LEISURE INDUSTRIES,
LTD., Plaintiff,

v.

George J. AUBIN, Defendant.

Civ. A. H–87–1754.

United States District Court,
S.D. Texas,
Houston Division.

Aug. 20, 1993.

Hugh L. McKenney, Houston, TX, for plaintiff.

Michael A. Maness, Houston, TX, for defendant.

## OPINION ON FINAL JUDGMENT

HUGHES, District Judge.

### 1. *Background.*

In 1987, George Aubin went to the Bahamas to gamble at the Cable Beach Hotel and Casino, owned by Carnival Leisure Industries, Ltd. He took more than $2,000 with him. He lost that at blackjack. This gambling is legal in the Bahamas. He then applied with the hotel for approval to issue drafts in exchange for chips. The application asked for his name, home address, business address, telephone numbers, driver's license number, social security number, bank, and bank account number. Aubin furnished all of this information. The casino approved acceptance of up to $25,000 of Aubin's drafts, if he chose to issue them.

As his stay progressed, Aubin issued the full $25,000 in drafts. The first two drafts were for $2,500, and the rest were for $5,000.

Each draft was printed with "pay to the order of Carnival Leisure Industries" and:

> I represent that I have received cash for the above amount and that said amount is on deposit in said financial entity in my name, is free and clear of claim and is subject to this check and is hereby assigned to payee, and I guarantee payment with exchange and costs in collecting.

Aubin wrote in the amounts and signed each draft. Carnival later added the name of his bank, the account number, the bank address, his home address, and the date.

For each draft Aubin signed, he received chips. He did not issue the drafts to pay money he had already lost. At Carnival's Cable Beach operation, chips are a general medium of exchange; they may be used to gamble or used to buy food, drink, clothing, rooms, entertainment, and other things legal in Texas and the Bahamas. Aubin, however, lost the $25,000 in less than two days of gambling. He returned to Houston. Over the next six weeks, Carnival sent Aubin a series of letters asking that he honor the drafts so it did not have to present them. Aubin did not respond to the letters, and Carnival presented the drafts to his bank for payment. Aubin had already directed his bank to stop payment.

In 1989, Carnival sued Aubin for $25,000. On summary judgment, this court awarded Carnival $25,000 plus attorney's fees and costs. The court of appeals found that Aubin gambled on credit and concluded that Texas public policy barred enforcement of his debt. *Carnival Leisure Industries, Ltd. v. Aubin,* 938 F.2d 624 (5th Cir.1991). On remand, Carnival recast its claim against Aubin to one for fraud and equitable estoppel.

### 2. *Texas Public Policy.*

Under a common law rule against illegal contracts generally, gambling debts are not enforceable in Texas. *Aubin v. Hunsucker,* 481 S.W.2d 952 (Tex.Civ.App.—Austin 1972, writ ref'd n.r.e.). Texas courts have broadly interpreted this public policy; debts that are "tainted" by gambling are unenforceable. *Gulf Collateral, Inc. v. Johnston,* 496 S.W.2d 123 (Tex.Civ.App.—Waco 1973,

writ ref'd n.r.e.). This rule persists in the face of a public policy that allows churches, charities, and the state itself to operate gambling establishments. The judicially-created policy has survived despite the public's having twice amended the Texas constitution to expand both private and socialist gambling.

Gambling was legal in Texas until the late 1940s when the legislature mandated that people in Texas could not gamble. The courts embellished the new legislation by declaring that gambling debts, like other illegal transactions, were not enforceable. Later the state said gambling was so evil and immoral that only churches and other charities could sponsor it through bingo games and raffles. Then the state allowed parimutuel gambling and betting at dog and horse tracks. Finally, the state concluded that potential profit outweighed the harm inherent in gambling. In 1992, the state launched a billion dollar state lottery. In the first 15 months, the state sold over $2.25 billion in lottery tickets. Public policy toward gambling has changed. The pendulum has swung.

The courts discovered a public policy against gambling debts based on the legislative prohibition of gambling and a common law rule about enforcing illegal contracts. Because gambling is no longer generally illegal in Texas and because the state sponsors and regulates it, there is no longer a foundation from which this secondary public policy can be derived. Asserting a sweeping public policy against gambling is anachronistic. If there really was a policy, it is totally defunct.

### 3. Debts and Drafts.

■ Texas state courts have held that gambling *debts* are not enforceable. If two people are shooting craps, and one goes $100 into the hole, that debt is not enforceable at law. Similarly, a note given later for that gambling debt is not enforceable. *Aubin*, 481 S.W.2d 952.

Negotiating a draft does not create a debt. The consideration is the medium of exchange received for the draft, whether it is dollars, Deutsche marks, sea shells, or poker chips. It is unclear whether the law of this case after the appeal extends beyond debts to drafts. Aubin contends that, even if the appellate court's holding does not extend to drafts, (a) the papers he signed were not negotiable instruments but rather promises to honor his debt to the casino, and (b) even if the papers are negotiable instruments, they are unenforceable on their face. Aubin's arguments are wholly unsupported by Texas law.

### A. Negotiable Instrument.

■ For each instrument Aubin signed in the casino, he received chips. His drafts were not made in payment of an existing, mounting debt; rather, he signed his name so that he could get more chips to gamble. In exchange for each draft, the casino delivered chips to him, many chips, which he promptly lost.

Aubin asserts that these papers were merely markers to keep track of his debt to the casino for what he lost at blackjack. Aubin is wrong. Under Texas law, these papers are negotiable instruments, specifically drafts. Tex.Bus. & Com.Code Ann. § 3.104 (1968). Each draft Aubin signed contained an unconditional promise to pay specified amounts, was payable to the order of Carnival, and was payable on demand. *Id.* at §§ 3.104, 3.108.

### B. Enforceability.

Aubin contends that even if the papers he signed are negotiable instruments, they are unenforceable on their face because they were incomplete when he signed them and he did not give Carnival authority to fill in the blanks. When Aubin signed the drafts, the spaces for the date, name of his bank, and account number were blank. His arguments are as successful as his gambling.

■ A negotiable instrument that is not dated is payable on demand. Tex.Bus. & Com.Code Ann. § 3.108; *First Nat'l Bank v. McKay*, 521 S.W.2d 661, 662 (Tex.Civ. App.—Houston [1st Dist.] 1975, no writ); *Gill v. Commonwealth Nat'l Bank of Dallas*, 504 S.W.2d 521, 523 (Tex.Civ.App.—Dallas 1973, writ ref'd n.r.e.). The negotiability of a draft is not affected by the

fact that it is post-dated, ante-dated, or not dated at all. Tex.Bus. & Com.Code Ann. § 3.114(a); *McKay*, 521 S.W.2d at 662.

■ Even though the drafts were payable on demand, Carnival did not intend to deposit the drafts until at least 30 days after Aubin signed them. Carnival wrote to Aubin twice, giving him ample opportunity to arrange alternate payment, before negotiating the drafts. Aubin ignored the letters. After attempting collection, Carnival wrote Aubin two more times asking that he honor the drafts. Aubin ignored these letters too. Aubin knew that Carnival intended to deposit the $25,000 of drafts. At no point could Aubin have concluded that Carnival did not intend to collect its money by depositing the drafts. *McKay*, 521 S.W.2d at 664.

■ Aubin further gripes that the drafts he signed did not have the name of his bank, the bank address, his account number, or his home address. He asserts that the drafts are unenforceable because they were not adequately complete and he did not give Carnival authority to complete them. As an ex-president of a bank, Aubin knows that this argument is wrong.

A complete draft must be signed by the maker and contain an order to pay, a designated payee, and the amount payable. Tex.Bus. & Com.Code Ann. §§ 3.104, 3.115(a) comment 2; *Hoss v. Fabacher*, 578 S.W.2d 454, 455 (Tex.Civ.App.—Houston [1st Dist.] 1979, no writ). When Aubin signed the drafts at the blackjack table, they were sufficient. Each was a promise to pay to the order of Carnival Leisure Industries, and the amount was precisely either $2,500 or $5,000.

■ These negotiable instruments are enforceable also as checks because each draft was drawn on Aubin's bank. Tex. Bus. & Com.Code Ann. § 3.104(b)(1). Aubin argues, however, that he did not authorize Carnival to add information to the instruments. A check is enforceable without the account number, bank address, or maker's home address. A negotiable instrument that is incomplete in any necessary respect is unenforceable until adequately completed by the maker or with the maker's authorization. Tex.Bus. & Com.Code Ann. § 3.115.

For the instruments to be enforceable as checks, Carnival must have had Aubin's authority to add his bank as the drawee. Tex.Bus. & Com.Code Ann. §§ 3.115(a), 3.407(a)(2). Before Texas adopted the Business and Commercial Code, a transferee had implied authority to complete incomplete instruments. *Antrim v. McMurrey*, 549 S.W.2d 463, 466 (Tex.Civ. App.—Austin 1977, no writ). Current Texas law does not expressly grant implied authority, but it places the burden of proof on Aubin to show that Carnival did not have authority to complete the drafts. *Id.* Aubin has not met this burden.

■ The presumption of implied authorization is difficult to overcome. *Id.* Aubin's testimony, five years after his loss, will not overcome the presumption that Carnival had authorization to complete the drafts. *Id.* There is no evidence that Aubin withheld authority to complete the drafts, but there is ample evidence that he gave Carnival authority because he gave Carnival the means to complete them.

For the first time in five years, Aubin claims that Carnival did not have authority to complete the drafts. The only reason he gave Carnival the information was so that Carnival could complete the drafts for him. Aubin gave the casino all of the information he now claims Carnival added to the drafts without his authorization. He filled out an application so that he could cash drafts at the casino. In giving Carnival the means to complete the drafts, he impliedly gave Carnival authorization to complete them. Carnival did not alter the drafts; it added the bank, account number, bank address, and Aubin's home address from Aubin's application. Tex.Bus. & Com.Code Ann. § 3.407.

### 4. *Aubin's Debt.*

■ Aubin owes Carnival $25,000; he is indebted to Carnival. His debt, however, arises from his unilateral stop payment order on the drafts. A stop payment order forbids the bank from paying the draft, but it does not affect Aubin's liability to Carnival.

*McKay,* 521 S.W.2d at 663. Aubin's debt to Carnival is manifestly different than a gambling debt.

These are the two most frequent instances in Texas cases:

A. At a poker game, X loses all of her money. She writes Y a $100 check, and Y gives her $100 cash. X loses the $100. Y attempts to cash the check at X's bank. X has stopped payment on the check.

B. During a poker game, X guesses that her straight will win. Y bets $500 on his hand. X wants to match the bet and raise it $100 but she has only $500. X bets the extra $100 on the cuff. Y's flush wins. X gives Y a note for the $100 she owed the pot. Y attempts to enforce the note.

 This first scenario is most common and analogous to the facts of this case. There is no gambling debt. When cash is given for a check and the cash is gambled and lost, the check is not tainted by gambling. *Lewis v. Alexander,* 51 Tex. 578 (1879); *Murry v. Campbell,* 338 S.W.2d 483 (Tex.Civ.App.—Amarillo 1960, no writ); *McDonough v. Zamora,* 338 S.W.2d 507 (Tex. Civ.App.—San Antonio 1960, writ ref'd n.r.e.); *Seibert v. Sally,* 238 S.W.2d 266 (Tex. Civ.App.—Galveston 1951, no writ); *Cleveland v. Taylor,* 49 Tex.Civ.App. 496, 108 S.W. 1037 (1908, no writ). If the lender has knowledge that the money might be used for gambling, that alone does not defeat the lender's right of recovery. *Lewis,* 51 Tex. at 591; *Cleveland,* 108 S.W. at 1039. Cashing a check is an independent and complete transaction. The check and money are exchanged before there is gambling; therefore, the transaction is not dependent on, nor tainted by, the gambling. An antecedent transaction is not tainted by later gambling.

 When a note is issued for a gambling debt, as in the second scenario, the note is tainted by gambling. *Gulf Collateral, Inc. v. Cauble,* 462 S.W.2d 619 (Tex.Civ.App.—Fort Worth 1971, no writ); *Seibert,* 238 S.W.2d 266. If a casino advances money to a gambler without contemporaneous consideration in the form of a check, draft, or note, and

that gambler loses the money, a gambling debt is created. If the gambler executes a note to pay for the gambling debt, the note is unenforceable because it is tainted by gambling. *Cauble,* 462 S.W.2d 619. The debt existed before the note, making the note dependent on the underlying gambling and gambling debt. Texas public policy will not enforce instruments issued for gambling debts. *Cauble,* 462 S.W.2d 619; *Seibert,* 238 S.W.2d 266.

Occasionally, however, Texas has misconstrued the policy, applying it to gambling situations generally where there is no antecedent debt. *See Johnston,* 496 S.W.2d 123; *Springer v. Sahara Casinos Co.,* 322 S.W.2d 33 (Tex.Civ.App.—Eastland 1959, writ dism'd). When one gives a casino a check in exchange for cash, the transaction is finished; because there is no antecedent gambling debt, the check is enforceable. *McDonough,* 338 S.W.2d 507. Courts that twist the facts or warp the public policy are not persuasive.

 Aubin did not gamble on credit, and his drafts were not payments for money he already lost. Under the law of the case doctrine, however, the taint assigned by the court of appeals to Aubin's debt is indelible. Even though Aubin's drafts do not create gambling debts and are independent transactions complete before the gambling, they are not enforceable as a matter of law because the court of appeals has spoken. *Carnival,* 938 F.2d 624.

### 5. Fraud and Equitable Estoppel.

 The elements of fraud are (a) a material misrepresentation of a present existing fact, (b) that was known to be false when made, (c) that was intended to be acted upon (d) that was relied upon, and (e) that caused injury. *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 688 (Tex.1990). Equitable estoppel further requires a showing that Carnival was not in the position to know that Aubin was misrepresenting his intent to pay. *Young v. Amoco Production Co.,* 610 F.Supp. 1479 (E.D.Tex.1985); *O'Dowd v. Johnson,* 666 S.W.2d 619 (Tex.Civ. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). Carnival has the burden of showing that at the time Aubin signed the drafts, it is

more likely than not that he intended not to pay them. *King v. Tubb*, 551 S.W.2d 436, 441 (Tex.Civ.App.—Corpus Christi 1977, no writ).

Aubin's position is that the drafts were really markers—merely a means for the casino to keep track of how much money a gambler lost and owed. He said that he never expected the casino actually to present the drafts to his bank for payment. He does insist, however, that he eventually intended to pay off his debt on his own schedule. Aubin claims that while he has owed American casinos large amounts of money, he gets around to paying them. Aubin even suggested that if Carnival would leave him alone, he might someday pay it as well.

 It is Aubin's own testimony that fuels Carnival's argument. Aubin was the president of a now failed savings and loan. He went to college, although he did not graduate. Eighteen years earlier, he legally weaseled on a gambling debt because the Texas courts would not enforce his debt to a gin-rummy opponent. *Aubin*, 481 S.W.2d 952. At the time Aubin gambled in the Bahamas, he had some knowledge that a gambling debt would not always be enforceable in Texas. When he issued the drafts, he did not have funds in his bank accounts to cover them; however, in February 1987, when Carnival presented the drafts to the bank for payment, he did have sufficient funds, but he had stopped payment on the drafts.

 When Aubin signed the drafts, he promised to pay Carnival by honoring the drafts. When there is a promise to do an act in the future, like pay on a draft, and there exists at the time of the promise an intention not to perform, there is a misrepresentation of an existing fact. *King*, 551 S.W.2d at 441. The misrepresentation comes from the intention not to perform. That Aubin stopped payment on the drafts is, by itself, insufficient to show that at the time he issued the drafts, he did not intend to pay them. In Texas, if one later denies making the promise to perform in the future, the denial itself establishes a lack of intent to perform at the time of the promise. *Southwestern Bell v. Meader Const. Co.*, 574 S.W.2d 839 (Tex.Civ.

App.—El Paso 1978, writ ref'd n.r.e.); *King*, 551 S.W.2d at 441. Aubin now says that he did not issue drafts and therefore did not expect that Carnival would attempt to cash them. In saying today that five years ago he signed only markers, Aubin also says that he never intended to honor the drafts. His denial today establishes that at the time he promised to pay Carnival, he did not intend to keep that promise.

Carnival has established by a preponderance of the evidence that Aubin never intended to honor the drafts. The evidence shows that (a) Aubin, the ex-president of a bank, knew he was issuing drafts, (b) at the time he issued the drafts, he did not intend for his bank to honor them, (c) Aubin intended that Carnival rely on the drafts, (d) Carnival reasonably relied on them, (e) Aubin gambled and lost the money, and in five years, he has made no effort to pay the drafts. Carnival has established sufficiently that Aubin intended to cheat it.

 Given that the court of appeals has ruled that Aubin's debt to Carnival is not enforceable, this court must decide if the public policy against fraud outweighs the judicially-created, confounded public policy against enforcement of illegal contracts when they are in the form of gambling debts.

Texas has a public policy against fraud. The policy is embodied in numerous statutes and common law rules. Whatever Texas's residual hostility toward gambling may be, nothing of jurisprudential significance would suggest that the state of Texas has a policy against the integrity of commercial instruments and transactions in favor of anyone, much less in favor of irresponsible recreational gamblers. Fraudulent issuance of a negotiable instrument is actionable, even in this context, as unsavory as some may consider it.

### 6. *Conclusion.*

Seasoned gamblers are shrewd manipulators. They know which debts are enforceable. An anachronistic public policy and misguided case law that forbid legal casinos from lawfully collecting commercial instruments and the debts arising from them will

eventually force collection efforts underground. While it may save moralistic posturing, it may cost knee-caps.

George Aubin defrauded Carnival Leisure Industries, Ltd. Carnival shall recover $25,000, attorney's fees, and costs from George Aubin. Attorney's fees and prejudgment interest will be liquidated as a post-judgment matter.