**YSLETA DEL SUR PUEBLO**

v.

**STATE OF TEXAS and Ann Richards, Governor of the State of Texas.**

No. P–93–CA–29.

United States District Court,
W.D. Texas,
Pecos Division.

Nov. 1, 1993.

Tom Diamond, Ron Jackson, John Batoon, Diamond, Rash, Gordon & Jackson, El Paso, TX, for plaintiffs.

Dan Morales, Will Pryor, Mary Keller, Jorge Vega, Toni Hunter, State Atty. Gen's. Office, Austin, TX, for defendants.

## MEMORANDUM OPINION AND ORDER

BUNTON, Senior District Judge.

**BEFORE THIS COURT,** in the above-captioned cause of action, are the following:

1. Defendants' Motion for Partial Summary Judgment with Brief in Support Thereof;

2. Plaintiff's Motion for Summary Judgment with Brief in Support Thereof;

3. Plaintiff's Response to Defendants' Motion for Partial Summary Judgment with Brief in Support Thereof;

4. Defendants' Response to Plaintiff's Motion for Summary Judgment with Brief in Support Thereof;

5. Plaintiff's Supplemental Motion for Summary Judgment with Brief in Support Thereof;

6. Defendants' Supplemental Motion for Summary Judgment with Brief in Support Thereof;

7. Plaintiff's Response to Defendants' Supplemental Motion for Summary Judgment with Brief in Support Thereof; and

8. Defendants' Reply to Plaintiff's Supplemental Motion for Summary Judgment.

### BACKGROUND

Plaintiff, Ysleta Del Sur Pueblo (hereinafter referred to as the "Tribe"), is a federally recognized Indian Tribe whose reservation is located in El Paso County, Texas. The Defendants are the State of Texas and Ann Richards, Governor of the State of Texas. On February 12, 1992, the Tribe requested that the Governor of Texas, Ann Richards, enter into negotiations for the formation of a compact with the Tribe which would allow the Tribe to conduct various types of gaming activities on their Tribal lands, pursuant to the Indian Gaming Regulatory Act (hereinafter referred to as "IGRA"), 25 U.S.C. § 2701, et seq. On March 5, 1992, Karen Abernathy, Director of Scheduling in the office of the Governor acknowledged the Tribe's request, but due to the Governor's heavy schedule,

declined to meet with the Tribe to discuss the possible formation of a compact.

However, over the period of the next thirteen months, several meetings did take place between Tribal representatives and representatives from the Governor's General Counsel. During the course of these meetings, the Tribe proposed several versions of a Tribal State Compact. The Governor's representatives refused to negotiate over any proposed compact which would include any casino-style games.

As a result of a newspaper article published in the final edition of *The Houston Post* on April 1, 1993, in which the Governor was quoted as saying that the State would not negotiate a compact which included casino-style games, the Tribe filed this action.

In the Tribe's Complaint, filed on April 15, 1993, the Tribe requested this Court to issue an Order requiring the State to enter into negotiations for the formation of a Tribal–State compact within a sixty day period from the entry of any such Order, pursuant to the IGRA. In the Tribe's First Amended Complaint, filed September 28, 1993, the Tribe seeks a determination as to exactly which games are the proper subject of negotiations of a Tribal–State compact under the IGRA.

## STANDARD ON MOTION FOR SUMMARY JUDGMENT

Summary judgment, "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Hansen v. Continental Ins. Co.,* 940 F.2d 971, 975 (5th Cir.1991); *Hogue v. Royse City,* 939 F.2d 1249, 1252 (5th Cir.1991). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1).

"All facts contained in the pleadings, depositions, admissions, and answers to interrogatories are reviewed by 'drawing all inferences most favorable to the party opposing the motion.'" *James v. Sadler,* 909 F.2d 834, 836 (5th Cir.1990) (quoting *Reid v. State Farm Mut. Auto Ins. Co.,* 784 F.2d 577, 578 (5th Cir.1986)); *Waltman v. Int'l Paper Co.,* 875 F.2d 468, 474 (5th Cir.1989); *Moore v. Mississippi Valley State Univ.,* 871 F.2d 545, 549 (5th Cir.1989); *Degan v. Ford Motor Co.,* 869 F.2d 889, 982 (5th Cir.1989). However,

> "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial."

*Duplantis v. Shell Offshore, Inc.,* 948 F.2d 187, 190–91 (5th Cir.1991) (quoting Fed. R.Civ.P. 56(e)).

Accordingly, the focus of this Court is upon disputes over material facts; that is, facts likely to affect the outcome of the lawsuit under the governing substantive law which will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Phillips Oil Co. v. OKC Corp.,* 812 F.2d 265, 272 (5th Cir.), *cert. denied,* 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 107 (1987). The Fifth Circuit stated, "[t]he standard of review is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the non-moving party based upon the record evidence before the court." *James,* 909 F.2d at 837; *see Matsushita Elec. Industr. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Boeing Co. v. Shipman,* 411 F.2d 365, 374–375 (5th Cir. 1969) (en banc).

The Supreme Court's 1986 trilogy of summary judgment cases clarified the test for summary judgment. In the first case of the trilogy, *Anderson,* the Court stated the trial court must consider the substantive burden of proof imposed on the party making the claim. A plaintiff has the burden with respect to each of his or her claims and a

defendant has the burden with respect to his or her defenses and claims for affirmative relief. *Anderson* requires this Court to substantively evaluate the evidence offered by the moving and nonmoving parties. "[T]he requirement is that there be no *genuine* issue of *material* fact." *Id.* at 248, 106 S.Ct. at 2510 (emphasis in original). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

In the second case of the trilogy, *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Supreme Court reiterated the requirement that once the party moving for summary judgment has made a prima facie showing there is no genuine issue as to any material fact, the nonmoving party must then come forward with "specific facts" showing a genuine issue for trial. "Its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. at 1356. The burden shifts to the nonmoving party to produce evidence in support of its claims. "The nonmovant can satisfy its burden by tendering depositions, affidavits, and other competent evidence to buttress its claim." *Topalian v. Ehrman*, 954 F.2d 1125, 1132 (5th Cir.1992). The nonmovant cannot establish a fact issue by resting on the mere allegations of the pleadings. "In fact, unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir.1985).

The third case of the trilogy, *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), held when the moving party shows the opposing party is unable to produce the evidence in support of its case, summary judgment is appropriate. The entry of summary judgment is mandated " 'after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and upon which that party will bear the burden of proof at trial.' " *Kidd v. Southwest Airlines, Co.*, 891 F.2d 540, 547 (5th Cir.1990) (quoting *Celotex Corp.*, 477 U.S. at 318, 106 S.Ct. at 2552). In *Celotex Corp.*, it was not necessary for the motion for summary judgment to be supported by affidavits or other materials specifically negating the nonmoving party's claim so long as the District Court was satisfied of the absence of evidence to support it.

Nothing in Rule 56(c) "requires that an oral hearing be held on a motion for summary judgment." *McMillian v. City of Rockmart*, 653 F.2d 907, 911 (5th Cir.1981); *see* Fed.R.Civ.P. 78; Local Court Rule CV–7(h). However, this Court has demonstrated its willingness to allow a nonmoving party a day in court in borderline cases where, under the governing law or reasonable extensions of existing law, the hearing of some testimony would be helpful to understanding the proper application of the law. However, such is not the situation in the case at bar.

### DISCUSSION

The issues presented by the Tribe and the State in their Motions for Summary Judgment are: (1) Whether or not, under the IGRA, the Governor and the State of Texas have failed to negotiate in good faith with the Tribe over the formation of a Tribal–State Compact; (2) which games that the Tribe has requested are the proper subject of negotiations under Class III gaming of the IGRA; (3) whether the Johnson Act, 15 U.S.C. § 1171, *et seq.*, prevent the transportation of the proposed gambling devices in the State of Texas; and (4) whether or not the Restoration Act, 25 U.S.C. § 1300g–6, prohibits gaming activities pursuant to the IGRA.

### THE IGRA FRAMEWORK

Congress enacted the IGRA in 1988. In § 2701 Congress listed its findings:

(1) numerous tribes have become engaged in or have licensed gaming activities on Indian lands as a means of generating tribal government revenue;

(3) existing Federal law does not provide clear standards or regulations for the conduct of gaming on Indian lands:

(4) a principal goal of Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government; and

(5) Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such activity.

25 U.S.C. § 2701.

The stated purposes of the IGRA are:

(1) to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting economic development, self-sufficiency, and strong tribal governments;

(2) to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operators and the players; and

(3) to declare that the establishment of independent Federal authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.

25 U.S.C. § 2702.

Under IGRA gaming is divided into three classes. Class I gaming includes "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individual as a part of, or in connection with, tribal ceremonies or celebrations." 25 U.S.C. § 2703(6). Class I gaming is subject to the exclusive jurisdiction of the Indian tribes. 25 U.S.C. § 2710(a)(1).

Class II gaming means "the game of chance commonly known as bingo (whether or not electronic, computer, or other technologic aids are used in connection therewith).....including (if played at the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo; and other games similar to bingo and card games that—(I) are explicitly authorized by the laws of the State, or (II) are not explicitly prohibited by the laws of the State and are played at any location in the State," provided such card games comply with the laws and regulations of the State regarding hours of operation, limitations on wagers, and pot sizes. 25 U.S.C. § 2703(7)(A). Class II gaming does not include "any banking card games, including baccarat, chemin de fer, or blackjack, or.... electronic or electromechanical facsimiles of any game of chance or slot machines of any kind." 25 U.S.C. § 2703(7)(B). The tribes have jurisdiction over Class II gaming, subject to the requirements of IGRA and the oversight of the National Indian Gaming Commission. 25 U.S.C. § 2710(b).

Class III gaming includes all forms of gaming that are not Class I or II gaming. 25 U.S.C. § 2703(8). The games that are in dispute are Class III games. In regard to Class III games the IGRA provides:

Class III gaming activities shall be lawful on Indian lands only if such activities are—

(A) authorized [by an approved Tribal] ordinance or resolution....,

(B) *located in a State that permits such gaming for any purpose by any person, organization, or entity,* and

(C) conducted in conformance with a Tribal–State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect.

25 U.S.C. § 2710(d) (emphasis added).

If a tribe wishes to engage in Class III gaming activities on tribal land, it must "request the state in which such lands are located to enter into such negotiations for the purpose of entering into a Tribal–State compact governing the conduct of gaming activities." 25 U.S.C. § 2710(d)(3)(a). Upon receiving the request, the state *must* negotiate in good faith with the tribe. *Id.* (emphasis added).

The stimulus that led to the passage of the IGRA was the Supreme Court's decision in *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). Before discussing *Cabazon* it is necessary to determine if Congress intended the *Cabazon* analysis to be applied in cases brought under the IGRA. 25 U.S.C. § 2710(d). The State of Texas asserts that the analysis in *Cabazon* should not be followed because Texas is not a P.L. 280 state. Pub.L. No. 83–280, codified as 18 U.S.C. § 1162 and 28 U.S.C. § 1360, gave certain states limited civil and general criminal jurisdiction in certain areas of Indian country within their borders. The State asserts that it is unnecessary for this Court to apply the civil/regulatory or criminal/prohibitory analysis because it is superseded by the language in the IGRA.

The definitive language in the IGRA in order to determine whether or not a particular game is the proper subject of a Tribal–State Compact is the phrase "located within a State that permits such gaming for any purpose by any person, organization or entity".

The Senate Report accompanying IGRA's passage provided the following guidance in construing the above mentioned language in IGRA:

> [T]he Committee anticipates that Federal courts will rely on the distinction between State criminal laws which prohibit certain activities and the civil laws of a State which impose a regulatory scheme upon those activities to determine whether class II games are allowed in certain States. This distinction has been discussed by the Federal Courts many times, most recently by the Supreme Court in *Cabazon.*

S.Rep. No. 446, 100th Cong., 2d Sess., reprinted in 1988 U.S.C.C.A.N. 3071, 3076. Although the language in the Report refers to Class II gaming, it also applies to Class III gaming. *See Mashantucket Pequot Tribe v. State of Conn.,* 913 F.2d 1024, 1030 (2d Cir. 1990), *cert. denied,* 499 U.S. 975, 111 S.Ct. 1620, 113 L.Ed.2d 717 (1991) (applying well settled principles of statutory construction the Court found the Senate Report's conclusion regarding the application of *Cabazon*

analysis applicable to Class III gaming). *See also U.S. v. Sisseton–Wahpeton Sioux Tribe,* 897 F.2d 358, 366 (8th Cir.1990); *Rumsey Indian Rancheria of Wintun Indians, Table Mountain Rancheria v. Wilson,* No. Civ–S–92–812, 1993 WL 360652 (E.D.Cal. July 20 1993), and *Seminole Tribe of Florida v. Florida,* No. 91–6756–CIV, 1993 WL 475999 (S.D.Fla. September 22, 1993). The civil/regulatory and criminal/prohibitory analysis was intended to be part of the IGRA framework determining the appropriate scope of Class III gaming.

In *Cabazon,* interpreting a California statute, which allowed some forms of bingo but not high stakes bingo, the Supreme Court found the statute to be regulatory in nature, stating:

> California does not prohibit all forms of gambling. California itself operates a state lottery, and daily encourages its citizens to participate in this state-run gambling. California also permits pari-mutuel horse-race betting. Although certain enumerated gambling games are prohibited ..., games not enumerated ... are permissible.... [B]ingo is legally sponsored by many different organizations and is widely played in California ... In light of the fact that California permits a substantial amount of gambling activity, including bingo, and actually promotes gambling through its state lottery, we must conclude that California regulates rather than prohibits gambling in general and bingo in particular.

480 U.S. at 211, 107 S.Ct. at 1089. The Court cautioned that the mere fact that a law could be enforced by criminal as well as civil mechanisms did not automatically convert it into a criminal law. The key is "whether the conduct at issue violates the State's public policy." 480 U.S. at 209, 107 S.Ct. at 1089.

■ The State maintains that Texas has a broad public policy against commercial gambling. Specifically they point out that Texas prohibits all forms of gambling with the exception of bingo, pari-mutuel betting on horse and dog races, charitable raffles, and the Texas lottery. Tex.Penal Code § 47.01 *et seq.* The Tribe maintains that the public

policy with respect to gaming in Texas is civil/regulatory.

Not only does Texas allow the above-mentioned gambling activities, but it also allows electronic, electromechanical, or mechanical games of chance as long as the reward is a non-cash prize with a value of no more than five dollars. Act of June 17, 1993, ch. 774, §, 1993 Tex.Sess.Law Serv. 3030 (Vernon). Additionally, wagers on carnival contests are not considered illegal so long as the prize is limited to merchandise worth no more than $25.00. Tex.Penal Code Ann. § 47.01(1)(C), (D) (Vernon Supp.1992). Finally, social gambling is not illegal if the place in which the gambling is conducted is private, there are even chances and risks, and there is no bank. Tex.Penal Code Ann. § 47.02(b).

It can no longer be asserted that Texas' public policy is against gambling. *Carnival Leisure Industries, Ltd. v. Aubin*, 830 F.Supp. 371 (S.D.Tex.1993). By allowing pari-mutuel gambling at horse and dog tracks, various bingo games, and promoting a multi-billion dollar lottery, Texas can no longer assert that it has a broad public policy against gambling, to so claim would be anachronistic. *Id. See also U.S. v. Sisseton–Wahpeton Sioux Tribe*, 897 F.2d 358, 367 (8th Cir.1990) (South Dakota law was civil/regulatory where state permitted bingo, horse and dog racing, a state lottery and slot machines); *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Wisconsin*, 770 F.Supp. 480 (W.D.Wis.1991), *app. dism'd*, 957 F.2d 515 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 91, 121 L.Ed.2d 53 (1992) (State law is civil/regulatory where it permits pari-mutuel betting on horse, dog and snow mobile racing, allows charitable raffles and bingo, and operates lottery and lotto). Thus this Court agrees with the Tribe, Texas is a civil/regulatory jurisdiction when it comes to gaming.

■ The IGRA and *Cabazon* combined demonstrate that a two-step analysis must be employed to determine which Class III games are the proper subject of a Tribal–State Compact. *Rumsey Indian Rancheria of Wintun Indians, Table Mountain Rancheria v. Wilson*, No. Civ-S–92–812, 1993 WL 360652 (E.D.Cal. July 20, 1993). In step one the court must determine whether the state permits the gaming activity to be played "for any purpose by any person" *Id.* If the game is permitted then it is clear that the game is the proper subject of a Tribal State Compact under the IGRA, thus the analysis ends at that point. However, if the game is not permitted by the state then the court must proceed to step two of the analysis. It is under step two that the *Cabazon* analysis is utilized to ascertain whether the proposed game violates the state's public policy. If the state's public policy does not prohibit the game, then the game is the proper subject of a Tribal–State Compact. The Court in *Rumsey* summarized the analysis as follows:

> The effect of IGRA is simply to provide a shortened application of the *Cabazon* rule where a game is found to be played within a state. In such instance, no further analysis is necessary to find the game is proper for a Tribal–State compact. In every other case, however, *Cabazon* retains its full vitality and a game will only be prohibited on Indian lands if it violates the state's public policy.

*Id.*

■ It is also important to note that the Tribe does not have to show that the state formally authorizes the same gaming activities of which they plan to offer; the key inquiry is whether the state prohibits those activities. *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Wisconsin*, 770 F.Supp. at 487.

### TRIBE'S PROPOSED GAMES

Black Jack, Roulette, Baccarat, Craps (Dice), and "Slot" machines, including electronic and electromechanical games of chance, are the games that the Tribe has sought to include in the negotiations of the Tribal–State Compact. The Tribe asserts that the games it has proposed should be included in the negotiation of a Tribal–State compact under the IGRA. The State asserts that the "casino-type" games the Tribe proposes are not permitted in Texas and are not the proper subject of any negotiations. Specifically, the State has maintained that the

only Class III gaming activities allowed are those which Texas expressly allows, pari-mutuel betting on horse and dog racing and the State Lottery. The State maintains the specific gaming activities requested by the Tribe are neither "played" nor allowed; therefore, such gaming activities should not be included in the negotiation of a Tribal–State Compact under the IGRA.

The Tribe maintains that each of the games it has requested are permitted in Texas. The Tribe uses the definition of "Lottery" as that term is defined in the State lottery Act in support of its position.

When the present State constitution was adopted, it contained the following provision:

> The legislature shall pass laws prohibiting the establishment of lotteries and gift enterprises in this State, as well as the sale of tickets in lotteries, gift enterprises or other evasions involving the lottery principle, established or existing in other States.

Tex. const. art. III, § 47 (1876). At that time there was no constitutional or legislative definition of "lottery". It was not until 1936 when the Texas Supreme Court decided *City of Wink v. Griffith Amusement Co.*, 129 Tex. 40, 100 S.W.2d 695 (1936) (citation omitted), in which the elements of a lottery were stated as the offering of a prize, the award of a prize by chance, and the giving of a consideration for an opportunity to win the prize.

The first legislative definition of the term "lottery" appeared in 1974 when Texas adopted its present Penal Code:

> "Lottery" means any scheme or procedure whereby one or more prizes are distributed by chance among persons who have paid or promised consideration for a chance to win anything of value, whether such scheme or procedure is called a pool, lottery, raffle, gift, gift enterprise, sale, policy game, or some other name.

Tex.Penal Code Ann. § 47.01(6) (Vernon 1989). On November 5, 1991, the State of Texas amended its constitution to provide that the Legislature by general law may authorize that State to operate lotteries. Tex. Const. Art. III, § 47(e) (1991). When the Legislature passed the State Lottery Act, lottery is defined as:

> "Lottery" means the procedures operated by the State under this Act through which prizes are awarded or distributed by chance among persons who have paid, or unconditionally agreed to pay, for a chance or other opportunity to receive a prize.

Tex.Rev.Civ.Stat.Ann. art. 179g, § 1.02(3) (Vernon Supp.1992). As evidenced by the above definition, lottery is broadly defined and includes as its elements prize, chance, and consideration.

The State argues that although the legislature could authorize casino gambling, that has no bearing on any issue before this Court. The State further argues that whether or not the gaming activities requested by the Tribe could fall under the definition of "lottery" in the Lottery Act is irrelevant. *Id.* The State appears to have missed the point. Again we return to the key phrase in IGRA: "permits such gaming for any purpose by any person, organization, or entity ...".

■ In determining whether Texas permits the gaming activities at issue it is not necessary to determine whether or not the State has given express approval to the playing of a particular game. *Lac du Flambeau Band of Lake Superior Chippewa Indians v. State of Wisconsin*, 770 F.Supp. at 486. In *Lac du Flambeau* the State of Wisconsin could engage in any game of chance, prize, and consideration under its lottery laws. The tribe sought to include casino games, video games and slot machines in its negotiations with Wisconsin. Wisconsin argued that since the games the tribe requested were not specifically authorized under state law, they were not required to negotiate over those types of games. The court concluded that since Wisconsin was a civil/regulatory jurisdiction, and under the lottery law the state was permitted to play any game of prize, chance and consideration, then it must negotiate a Tribal–State compact governing the conduct of any type of class III gaming requested by the tribe which involved prize, chance and consideration. This Court agrees with the reasoning of *Lac du Flambeau.*

The State cites *Seminole Tribe of Florida v. Florida*, No. 91–6756–CIV, 1993 WL 475999 (S.D.Fla. September 22, 1993), for the·

proposition that just because the state allows some types of Class III gaming to occur the state is not required to engage in negotiations over all types of Class III gaming activities. The Court agrees with the State in that regard; however, the court in *Seminole* was interpreting Florida's Constitution and Statutes, not Texas'. Furthermore the Tribe does not advance that position before this Court, they maintain that the games they seek to include in the negotiations are permissible under the existing laws of Texas.

Interpreting the Texas Lottery Act, the only restriction found with regard to the Act's broad definition of lottery is contained in § 2.02(k):

> The Comptroller shall adopt rules prohibiting the operation of any game using a video lottery machine or machine. As used in this subsection "video lottery machine" or "machine" means any electronic video game machine that, upon the insertion of cash, is available to play or simulate the play of a video game, including but not limited to video poker, keno, and blackjack, utilizing a video display in microprocessors in which the player may receive free games or credits that can be redeemed for cash, coins or tokens, or that directly dispenses cash, coins, or tokens.

Tex.Rev.Civ.Stat.Ann. art. 179g, § 2.02(k) (Vernon Supp.1992). The State Lottery Act only excludes the video forms of casino games, not the live or other non-video electronic games.

The Texas Lottery Act is not the only legislation that supports the Tribe's position that Texas allows "casino gaming". In section 47.01 of the Texas Penal Code a bet is defined as:

> "Bet" means an agreement that, dependent on chance even though accompanied by some skill, one stands to win or lose something of value. A bet does not include:
>
> (A) . . . . .
>
> (B) . . . . .
>
> (C) an offer of merchandise with a value not greater than $25, made by the proprietor of a bona fide carnival contest conducted at a carnival sponsored by a non-

profit religious, fraternal, school, law enforcement, youth, agricultural, or civic group, if the person to receive the merchandise from the proprietor is the person who performs the carnival contest.

Texas Penal Code Ann. § 47.01 (Vernon 1989). The above exception is referred to as the "carnival exception". A recent opinion of Attorney General Dan Morales dated April 20, 1992, dealing with the validity of casino nights sponsored by charitable organizations held that they would be in violation of the law unless they came within the carnival exception. The opinion states:

> Those participating in "casino games" at the described non profit charitable organizations fund raising event would violate the Penal Code § 47.02 prohibition on gambling—"making bets"—unless as a matter of fact, the "casino games" in question would fall within the "carnival contests" exception to the definition of "bet" in the Penal Code § 47.01(1)(C) and (D).

Op.Tex.Att'y Gen. No. DM–112 (1992).

Thus, it is clear that casino gaming is permitted under the carnival exception; therefore satisfying the requirement of section 2710(d)(1) of IGRA. . . . "permits such gaming *for any purpose by any person, organization, or entity . . . .*". (emphasis added).

On June 17, 1993, section 47.01 of the Texas Penal Code was amended to exclude from the definition of gambling device:

> . . . any electromechanical or mechanical contrivance designed, made, and adopted solely for bona fide amusement purposes if the contrivance rewards the player exclusively with noncash merchandise prizes, toys, or novelties or representation of value redeemable for those items which have a wholesale value available from a single play of the game or device of not more than 10 times the amount charged to play the game or device once or $5.00, whichever is less.

Act of June 17, 1993, ch. 774, § 1, 1993 Tex.Sess. Laws 3030 (Vernon).

Because casino gaming is permitted by some persons and individuals under the carnival exception, and based on the definition of "lottery" in the Texas Lottery Act allow-

ing games which include chance, prize, and consideration, the Court is of the opinion that the casino games requested by the Tribe should be included in the negotiations of a Tribal–State Compact under the IGRA.

### GOOD–FAITH NEGOTIATIONS UNDER IGRA

The Tribe, in addition to asserting that the State has "wholly" failed to negotiate, asserts that the State has failed to negotiate in good faith. The State has consistently refused to negotiate with the Tribe concerning the "casino style" games the tribe has proposed. The State has maintained that the proposed games are not allowed in Texas; therefore it has repeatedly refused to engage in negotiations over the Tribe's proposed games.

■ When the State wholly fails to negotiate it cannot meet its burden of proof to show that it has negotiated in good faith. *Mashantucket Pequot Tribe v. State of Connecticut*, 913 F.2d 1024 (2nd Cir.1990). Furthermore:

The State's protestations that its failure to negotiate resulted from sincerely held views as to the meaning of the IGRA, and that it declared its willingness to resolve these legal issues of first impression by litigation, do not alter the outcome. The statutory terms are clear, and provide no exception for sincere but erroneous legal analyses. Further, the manifest purpose of the statute is to move negotiations toward a resolution where a state either fails to negotiate, or fails to negotiate in good faith, for 180 days after a tribal request to negotiate. The delay is hardly ameliorated because that state's refusal to negotiate is not malicious.

*Id.* *See also Lac du Flambeau Band of Lake Superior Chippewa Indians v. Wisconsin,* 770 F.Supp. at 482 (where the state wholly fails to negotiate, it cannot meet its burden to establish that it has bargained in good faith).

It is not necessary to repeat the State's position, suffice it to say that it is clear that the State has failed to negotiate with the Tribe. Before the Court concludes that the State must negotiate with the Tribe, the State's arguments under the Johnson Act and the Restoration Act must be addressed.

### JOHNSON ACT

The State contends that the transportation of any gambling devices would be illegal under the Johnson Act, 15 U.S.C. § 1172. Gambling devices are defined as, among other things, any slot machine or other:

machine or mechanical device (including, but not limited to, roulette wheels and similar devices) designed and manufactured primarily for use in connection with gambling, and (A) which when operated may deliver, as the result of the application of an element of chance, any money or property, or (B) by the operation of which a person may be entitled to receive, as the result of the application of an element of chance, any money or property ...

*Id.* at § 1171(a)(2). The IGRA expressly provides that the prohibitions contained in the Johnson Act "shall not apply to any gaming conducted under a Tribal–State Compact that ... (A) is entered into.... by a State in which gambling devices are legal, and (B) is in effect." 25 U.S.C. § 2710(d)(6). To support their position the Defendant's cite *Citizen Band Potawatomi Indian Tribe of Oklahoma v. Greene,* 995 F.2d 179 (10th Cir. 1993).

In *Potawatomi,* the Tenth Circuit Court of Appeals held that since video lottery terminals were not allowed under the provisions of Oklahoma law, the Johnson Act prohibited their transportation and the waiver contained in the IGRA did not apply since the subject gambling devices were not legal in the state of Oklahoma. The holding of *Potawatomi* is narrow, gambling devices that are not legal in the subject state cannot be transported or used within Indian country within that state absent a statutory exception to the prohibition. Oklahoma has no state run lottery and does not allow the numerous gambling activities that Texas permits.

■ Additionally, the language of § 1172 under the IGRA expressly permits transportation of gambling devices, if those devices are designed "for use at and transported to licensed gambling establishments where bet-

ting is legal under applicable laws ...." 15 U.S.C. § 1172. It is the opinion of the Court that the type of gambling devices at issue are exempt from the Johnson Act pursuant to section 2710(d)(6) of the IGRA.

### RESTORATION ACT

 The State of Texas argues that 25 U.S.C., § 1300g–6 of the Restoration Act, which restored federal trust status to the Ysleta Del Sur Pueblo in 1987, precludes gaming by the tribe pursuant to the IGRA.

As part of the Restoration Act, § 1300g–6, prohibited the tribe from engaging in any gaming activity that was prohibited by the laws of the State of Texas. Section 1300g–6 provides:

(a) In general

All gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on lands of the tribe. Any violation of the prohibition provided in this subsection will be subject to the same civil and criminal penalties that are provided by the laws of the State of Texas. The provisions of this subsection are enacted in accordance with the tribe's request in Tribal Resolution No. T.C.–02–86 which was approved and certified on March 12, 1986.

(b) No State regulatory jurisdiction

Nothing in this section shall be construed as a grant of civil or criminal regulatory jurisdiction to the State of Texas.

The clear purpose and intent of the IGRA is to further the economic development of Indian Tribes and to further the longstanding federal goal of establishing tribal independence and self-sufficiency. The State is basically arguing that the IGRA and its clear purpose, allowing gaming activities to be conducted by tribes on tribal lands, should be ignored and that the Ysleta Del Sur Pueblo be barred from obtaining the benefits IGRA was intended to provide for Indian Tribes, this the Court is unwilling to do. The law is clear and well settled, it is basic statutory construction that where there is a conflict in two statutory enactments, the latter enactment will control *U.S. v. Crittenden*, 600 F.2d 478 (5th Cir.1979).

Even if this Court were to follow the State's argument, the Restoration Act would have no effect on the relief the Tribe requests. The Tribe has requested Class III gaming activities which are not prohibited by the laws of the State of Texas.

### CONCLUSION

The Court finds that the State is required to negotiate with the Tribe concerning the casino-type games of chance that the tribe has proposed. Furthermore, neither the Johnson Act nor the Restoration Act prohibits the games that the Tribe has proposed.

**IT IS ORDERED** that the State of Texas is required to conclude a Tribal–State Class III Gaming Compact with Plaintiff Ysleta Del Sur Pueblo Indians within sixty (60) days from the date of this Order.