3 F.3d 273
 CHEYENNE RIVER SIOUX TRIBE, Appellant/Cross-Appellee,
v.
STATE OF SOUTH DAKOTA; George S. Michelson, Governor,
personally and in his official capacity; Mark W. Barnett,
Attorney General, personally and in his official capacity;
Grant Gormley, State Negotiator, personally and in his
official capacity; John Guhim, State Negotiator, personally
and in his official capacity, Appellees/Cross-Appellants.
 Nos. 93-1224, 93-1521.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 16, 1993.
Decided Aug. 23, 1993.
Rehearing and Suggestion for
Rehearing En Banc Denied Oct. 4, 1993.
 
 Mark C. Van Norman, Eagle Butte, SD, argued (Steven C. Emery and Timothy W. Joranko, on the brief), for appellant/cross-appellee.
 Lawrence E. Long, Chief Deputy Atty. Gen., Pierre, SD, argued (Richard J. Helsper, Brookings, SD, on the brief), for appellees/cross-appellants.
 Before McMILLIAN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and HANSEN, Circuit Judge.
 McMILLIAN, Circuit Judge.
 
 
 1
 The Cheyenne River Sioux Tribe (tribe) appeals from an order entered in the United States District Court for the District of South Dakota[1] which denied the tribe's motion for a preliminary injunction and summary judgment. 830 F.Supp. 523. The tribe filed this action in federal district court against the State of South Dakota and several state officials, in their official and personal capacities (collectively referred to as the state), pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. Sec. 2701 et seq. (1988) (IGRA). The tribe sought to remedy the alleged failure of the state to negotiate in good faith regarding certain gaming activities to be conducted on and off the tribe's reservation lands and to reach an agreement on a tribal-state gaming compact. The tribe appeals from the order denying it preliminary injunctive relief and summary judgment, while the state cross-appeals the denial of its motion for summary judgment. We affirm the order of the district court for the reasons discussed below.
 
 I.
 
 2
 On January 9, 1991, the tribe requested that the state negotiate a tribal-state compact to allow the tribe to operate gaming facilities on the reservation under the IGRA. The IGRA was enacted after a decision by the Supreme Court in 1987 which held that California could not enforce state and local gaming laws against the Indian tribes because California law only regulated and did not prohibit gaming. California v. Cabazon Band of Mission Indians, 480 U.S. 202, 221-22, 107 S.Ct. 1083, 1094-95, 94 L.Ed.2d 244 (1987). This case established that in states that permit gambling Indian tribes have the authority to license and operate gaming on Indian lands free from state regulation. Id. This opened the door to extensive gambling on Indian lands. In 1988, Congress responded to the decision by enacting the IGRA.
 
 
 3
 The IGRA divides gaming into three classes: (1) class I gaming includes social gaming for minimal prizes and traditional Indian gaming conducted at ceremonies or celebrations; (2) class II gaming includes bingo, lotto, pull-tabs, punch boards, tip jars, and non-banking[2] card games, as well as banking card games operated on or before May 1, 1988; and (3) class III gaming includes casino-type gambling, parimutuel horse and dog racing, lotteries, and all other forms of gaming that are not class I or class II gaming. 25 U.S.C. Sec. 2703(6)-(8). Class I gaming on Indian lands is within the exclusive jurisdiction of the tribes and is not subject to the IGRA. Id. Sec. 2710(a)(1). Class II gaming on Indian lands is within the jurisdiction of the tribes, but is subject to the provisions of the IGRA, including oversight by the National Indian Gaming Commission within the Department of the Interior. Id. Sec. 2710(a)(2), (b)(1)(A), (B). Class III gaming activities are lawful on Indian lands only if authorized by a tribal ordinance or resolution, located in a state that permits such gaming for any purpose by any person, organization, or entity, and conducted in conformance with a tribal-state compact entered into by the tribe and state. Id. Sec. 2710(d)(1)(A)-(C).
 
 
 4
 The IGRA provides a "framework" for negotiation of tribal-state gaming compacts--the tribe requests the state to enter into negotiations; upon receiving such a request, the state "shall" negotiate with the tribe "in good faith" to enter such a compact. Id. Sec. 2710(d)(3)(A). Any such compact takes effect only after approval by the Secretary of the Department of the Interior. Id. Sec. 2710(d)(4). Tribal-state compacts can include provisions regarding the application of criminal and civil laws and regulations, allocation of criminal and civil jurisdiction between the tribe and state, taxation by the tribe, remedies for breach of contract, standards for the operation and maintenance of gaming facilities including licensing, and any other subjects directly related to the operation of gaming activities. Id. Sec. 2710(d)(3)(C).
 
 
 5
 The IGRA provides the United States district courts with jurisdiction over "any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal-State compact ... or to conduct such negotiations in good faith." Id. Sec. 2710(d)(7)(A)(i). Upon the introduction of evidence by the tribe that negotiations began more than 180 days before, no tribal-state compact was concluded, and the state did not respond to its request for negotiations or did not respond in good faith, the burden of proof shifts to the state to prove that it has negotiated in good faith. Id. Sec. 2710(d)(7)(B)(ii). If the district court finds that the state has failed to negotiate in good faith, the district court "shall order the State and Tribe to conclude such a compact within a 60-day period." Id. Sec. 2710(d)(7)(B)(iii). This is the injunctive relief sought by the tribe in the present case.
 
 
 6
 The IGRA further provides that if the tribe and state fail to conclude a compact after 60 days, the tribe and the state then each submits to a mediator appointed by the district court a proposed compact that represents their last best offer; the mediator then selects the one which best comports with the IGRA and presents it to the tribe and state. Id. Sec. 2710(d)(7)(B)(iv), (v). If the state consents to the proposed compact submitted by the mediator within 60 days, then the proposed compact becomes the tribal-state compact. Id. Sec. 2710(d)(7)(B)(vi). However, if the state does not consent within 60 days, then the mediator notifies the Secretary of the Department of the Interior, who, in consultation with the tribe, prescribes procedures consistent with the proposed compact selected by the mediator, the IGRA, and relevant state law, under which the tribe can then conduct class III gaming on Indian lands over which the tribe has jurisdiction. Id. Sec. 2710(d)(7)(B)(vii).
 
 
 7
 Since 1989, South Dakota has allowed state lotteries, video lottery, limited card games, slot machines, parimutuel horse and dog racing, and simulcasting. South Dakota has located within its boundaries nine federally recognized tribes.[3] The first tribe to request negotiations toward a class III gaming compact under the IGRA was the Flandreau Santee Tribe in June 1989. Negotiations between the state and the Flandreau Santee Tribe broke down after about five months and the tribe sued South Dakota under the IGRA; however, the case was finally settled by the execution of a compact between the state and the tribe, approved by the Bureau of Indian Affairs (BIA) on July 26, 1990. Similar gaming compacts have been negotiated and executed between the state and five other tribes--the Sisseton-Wahpeton Sioux Tribe, March 1991; the Yankton Sioux Tribe, June 1991; the Lower Brule Sioux Tribe, September 1991; the Crow Creek Sioux Tribe, April 1992; and the Standing Rock Sioux Tribe, August 1992. The only other location in South Dakota to offer gaming similar to class III gaming under IGRA is the historic community of Deadwood.
 
 
 8
 When the Cheyenne River Sioux Tribe requested the state to negotiate a tribal-state compact, five "official" negotiations between tribal and state officials were held through August 1991. Tribal officials also met with the governor on three occasions before filing suit against the state. The tribe alleges the state refused to negotiate in good faith because the state adopted a "rigid" negotiation strategy by offering the tribe the so-called "Flandreau compact,"[4] which the state used as a "model" in all subsequent tribal-state compact negotiations. If the tribe wanted more favorable terms than those in the Flandreau compact, the state demanded certain concessions, for example, expanded state criminal jurisdiction. The tribe contends the state refused to consider the particular circumstances and interests of the Cheyenne River Sioux Tribe. The tribe argues there are significant differences between the Cheyenne River Sioux and Flandreau Santee Sioux Tribes that make it unreasonable to impose the Flandreau compact on the Cheyenne River Sioux Tribe. The Cheyenne River Sioux reservation is about the size of Connecticut and is located in a remote western part of the state, far from population centers, which are located in the southeastern corner of the state (near the Iowa and Nebraska borders). The Cheyenne River Sioux Tribe has at least 10 times the members of the Flandreau Santee Sioux Tribe and, unlike the Flandreau Santee Sioux Tribe, has a mature tribal government, including tribal police and tribal courts. In addition, the tribe alleges the state refused to negotiate a tribal-state compact to include keno and other games permitted by state law, higher bet limits, and gaming sites on commercially valuable Indian trust lands located near Fort Pierre and Pluma.
 
 
 9
 The tribe filed the present action in April 1992 alleging violation of the IGRA and 42 U.S.C. Sec. 1983 and seeking declaratory relief and injunctive relief ordering the tribe and state to conclude a tribal-state gaming compact within 60 days. In May 1992 the tribe moved for summary judgment and preliminary injunctive relief on the ground that the state's refusal to negotiate in good faith had prevented the tribe from operating a gaming facility, thus depriving the tribe of gambling revenues and other opportunities for economic development. The state also moved for summary judgment arguing the action was barred by the eleventh amendment and the IGRA violated the tenth amendment.
 
 
 10
 The district court held the eleventh amendment barred the Sec. 1983 claim but not the IGRA claim. Cheyenne River Sioux Tribe v. South Dakota, 830 F.Supp. 523, 525-26 (D.S.D.1993) (Cheyenne River ). The district court held the IGRA did not violate the tenth amendment because the IGRA does not force the state to negotiate compacts with the tribes or force the state to permit tribal gambling if state law prohibits gambling in general. Id. 830 F.Supp. at 526-27. Further the district court found the state negotiated with the tribe in good faith--that bet limits are set by state law, video keno and traditional keno are not the same game and state law does not permit traditional keno, and there are genuine issues of material fact in dispute about whether the Fort Pierre and Pluma lands are Indian lands within the meaning of the IGRA.[5] Id. 830 F.Supp. at 527-29. For these reasons, the district court denied the tribe's motions for preliminary injunctive relief and summary judgment and the state's motion for summary judgment, and stayed the action to accommodate further negotiations. This appeal by the tribe and cross-appeal by the state followed.
 
 
 11
 The tribe argues the district court abused its discretion in denying its motions for summary judgment and for preliminary injunctive relief because it misconstrued the IGRA requirement of good faith and the IGRA definition of Indian lands. The state argues the district court erred by not applying eleventh amendment immunity to this issue and by not holding the IGRA unconstitutional under the tenth amendment.
 
 
 12
 This court has appellate jurisdiction over the order denying the motion for preliminary injunctive relief pursuant to 28 U.S.C. Sec. 1292(a)(1). In addition, we may review the order denying both motions for summary judgment as well because "where the injunction is interdependent with the remainder of the appealed order, we may review the entire order insofar as it has been appealed." Union National Bank v. Federal National Mortgage Ass'n, 860 F.2d 847, 852 (8th Cir.1988) (order dismissing tortious interference and RICO claims considered with order denying preliminary injunction); see also TransWorld Airlines, Inc. v. American Coupon Exchange, Inc., 913 F.2d 676, 680 (9th Cir.1990) (denial of summary judgment considered with injunction). We review the denial of injunctive relief for an abuse of discretion. Tenant Affairs Bd. v. Pierce, 693 F.2d 797, 798 (8th Cir.1982); Sperry Corp. v. City of Minneapolis, 680 F.2d 1234, 1237 (8th Cir.1982); FTC v. National Tea Co., 603 F.2d 694, 696 (8th Cir.1979). The district court's denial of summary judgment will be reviewed de novo as well as its determinations of state law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986) (summary judgment); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986) (summary judgment); Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir.1992) (summary judgment); Ford v. Dowd, 931 F.2d 1286, 1289 (8th Cir.1991) (summary judgment); see Salve Regina College v. Russell, 499 U.S. 225, 231-32, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991) (state law).
 
 II.
 A. Keno
 
 13
 The district court found the state does not permit the traditional form of keno as a legalized form of gambling in South Dakota. Cheyenne River, 830 F.Supp. at 528. The only form of keno permitted by the state is video keno; therefore, the district court concluded the state was required to negotiate only the subject of video keno and not traditional keno. Id.
 
 
 14
 The tribe argues the district court erroneously construed the IGRA to limit the scope of class III gaming to those particular forms that state law permits. The tribe contends that because the state permits a form of keno (video keno) to be played, the tribe should be allowed to host traditional keno. In addition, the tribe introduced evidence that charities often advertise and operate "Las Vegas" nights which include casino-type games such as craps and blackjack. For these reasons the tribe argues the state could not in good faith flatly refuse to negotiate about the tribe's conducting similar casino-type gambling and traditional keno.
 
 
 15
 The state argues that "traditional" keno is illegal in South Dakota and in any event is fundamentally different than video keno. No other tribes in the state are permitted to operate "traditional" keno, and the state argues it would be unfair to the other tribes to permit the Cheyenne River Sioux Tribe to do so. With regard to the allegation that charities host casino nights, the state contends that state law only permits charities to operate bingo and raffles, not casino-type gambling, and that if in fact casino-type gambling is conducted by charities, it is illegal.
 
 
 16
 We agree with the state that it need not negotiate traditional keno if only video keno is permitted in South Dakota. The "such gaming" language of 25 U.S.C. Sec. 2710(d)(1)(B) does not require the state to negotiate with respect to forms of gaming it does not presently permit. Because video keno and traditional keno are not the same and video keno is the only form of keno allowed under state law, it would be illegal, in addition to being unfair to the other tribes, for the tribe to offer traditional keno to its patrons. Therefore, we agree with the district court that the state did not refuse to negotiate in good faith on the tribe's operation of traditional keno.
 
 B. Bet limits
 
 17
 The district court found the issue of bet limits is not subject to negotiation because bet limits are established by state law. Cheyenne River, 830 F.Supp. at 527-28. The district court held the record did not support a finding of bad faith because the state refused to negotiate bet limits. Id.
 
 
 18
 The tribe argues that even though the state officials repeatedly stated that bet limits were subject to negotiation, the governor would not negotiate bet limits with the tribe. The tribe argues the state's false representation that bet limits were subject to negotiation, as well as its failure to negotiate bet limits, illustrates the state's failure to negotiate in good faith.
 
 
 19
 The state argues that state law establishes bet limits and that the state is not required to permit the tribe to operate under higher bet limits than other tribes in the state or Deadwood. The state indicated that it would not agree to any compact that included bet limits in excess of the state statutory limit of $5. The state distinguishes the "grandfathered" blackjack games at issue in United States v. Sisseton-Wahpeton Sioux Tribe, 897 F.2d 358 (8th Cir.1990) (higher bet limits on games established before effective date of IGRA).
 
 
 20
 We agree with the state that it need not negotiate regarding bet limits because bet limits are established by state law. The state is not obligated to allow the tribe to operate under bet limits higher than the state statutory limit of $5. Accordingly, we agree with the district court that the state did not refuse to negotiate in good faith on the issue of higher bet limits.
 
 C. Casino Locations
 
 21
 The tribe sought to obtain a compact for two off-reservation sites, one near Fort Pierre and the other at Pluma in the Black Hills. The district court denied summary judgment on the issue of casino locations because there were genuine issues of disputed material fact as well as legal issues. Cheyenne River, --- F.Supp. at ---- slip op. at 12. The National Indian Gaming Commission has defined Indian lands as:
 
 
 22
 (a) Land within the limits of an Indian reservation or
 
 
 23
 (b) Land over which an Indian tribe exercises governmental power and that is either--
 
 
 24
 (1) Held in trust by the United States for the benefit of any Indian tribe or individual; or
 
 
 25
 (2) Held by an Indian tribe or individual subject to restriction by the United States against alienation.
 
 
 26
 25 C.F.R. Sec. 502.12. The district court explained that the Pluma and Fort Pierre sites do not satisfy part (a); however, the district court decided that it could not determine the status of the sites under part (b) without more facts. Cheyenne River, 830 F.Supp. at 528. Therefore, the district court held that summary judgment was not warranted. Id.
 
 
 27
 The tribe contends that the district court misinterpreted the term "Indian lands" as used in the IGRA, 25 U.S.C. Sec. 2703(4), to not include these sites. The tribe argues Indian law differentiates between trust lands and restricted lands and argues the IGRA definition of "Indian lands" requires proof of tribal exercise of governmental power only with respect to restricted lands, not trust lands. The tribe asserts that the two off-reservation sites are trust lands and that the tribe exercises governmental power over these lands; therefore, the tribe argues these lands are "Indian lands" within the meaning of the IGRA and thus the state could not in good faith flatly refuse to negotiate about the tribe's locating gaming facilities there.
 
 
 28
 The state argues the correct construction of the definition of "Indian lands" in the IGRA requires land be both within the boundaries of the reservation and held in trust or as restricted land over which the tribe exercises governmental power. It is undisputed that the Pluma and Fort Pierre sites are located outside the boundaries of the Cheyenne River Sioux Reservation; therefore, the state argues that it is irrelevant whether or not the title is held in trust or the land is restricted land or whether the tribe exercises governmental control over it.
 
 
 29
 We disagree with the state's contention that land must be located within an Indian reservation to be considered Indian lands under the IGRA. Pursuant to the definition of the Indian Gaming Commission, land must either be within an Indian reservation or be trust or restricted land over which an Indian tribe exercises governmental power. However, we agree with the district court that summary judgment was not appropriate without more facts to clarify the status of the Fort Pierre and Pluma lands under part (b) of the Indian Gaming Commission's definition.
 
 III.
 
 30
 On cross-appeal the state argues the tribe's action is barred by the eleventh amendment and relies upon Poarch Band of Creek Indians v. Alabama, 776 F.Supp. 550, 554-63 (S.D.Ala.1991) (Poarch ), appeal filed, No. 92-6244 (11th Cir. argued Jan. 7, 1993).[6] The state argues the district court erred in holding it had waived its eleventh amendment immunity by engaging in tribal-state compact negotiations with the tribe and argues the state can only effectively waive its eleventh amendment immunity through legislative action.
 
 
 31
 The tribe argues the district court correctly found the state has waived its eleventh amendment immunity by conducting tribal-state compact negotiations and by seeking to take advantage of the present litigation for its own benefit. The tribe also argues the district court correctly held that Congress had abrogated the states' eleventh amendment immunity by enacting the IGRA pursuant to its power under the Indian Commerce Clause, citing Seminole Tribe v. Florida, 801 F.Supp. 655, 657-63 (S.D.Fla.1992) (Seminole Tribe ) (holding Congress did abrogate the states' eleventh amendment immunity by enacting the IGRA and had the constitutional power to do so pursuant to the Indian Commerce Clause), appeal filed, No. 92-4652 (11th Cir. argued Jan. 7, 1993).
 
 
 32
 The court in Seminole Tribe held that "in expressly providing for federal jurisdiction over claims brought by Indian tribes against States to compel good faith negotiations under IGRA, Congress made its intention to abrogate the States' [eleventh amendment] immunity in [25 U.S.C. Sec. 2710(d)(7)(A)(i) ] 'unmistakably clear in the language of the statute.' " Id. at 658, citing Atascadero State Hospital v. Scanlon, 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985). The court further held Congress had the power to abrogate the states' eleventh amendment immunity, stating:
 
 
 33
 [g]iven Congress' plenary authority over Indian relations, explicitly noted in the text of the Constitution at Article I, Sec. 8, cl. 3, and the uniquely federal issues raised when such authority is exercised, considered in conjunction with the principles enunciated by the Supreme Court in Pennsylvania v. Union Gas Co., 491 U.S. 1 [109 S.Ct. 2273, 105 L.Ed.2d 1] (1989), ... Congress, when acting pursuant to the Indian Commerce Clause, has the power to abrogate the States' [eleventh amendment] immunity.
 
 
 34
 801 F.Supp. at 658. While a few courts have held otherwise,[7] we agree with the holding in Seminole Tribe and the district court that the eleventh amendment does not preclude an action against the state under the IGRA. We believe the express provision for federal jurisdiction over claims under the IGRA is sufficient to abrogate the states' eleventh amendment immunity. In addition, the state actively engaged in negotiating tribal-state compacts and has reaped the benefits from these negotiations by being able to supervise how Indian gaming will be conducted within the state. Therefore, we hold the present action is not barred by the eleventh amendment.
 
 IV.
 
 35
 The state also contends that the IGRA violates the tenth amendment by forcing states to negotiate tribal-state gaming compacts. The state argues that because the IGRA imposes mandatory duties on the states, it is an impermissibly coercive scheme. The tribe argues the district court correctly held the IGRA does not force the state to do anything because the state can refuse to respond to the tribe's request to negotiate. The tribe adds that the IGRA permissibly offers the states incentives to negotiate and conclude tribal-state compacts on gambling, but it does not force them to do so.
 
 
 36
 We agree with the district court that the IGRA "gives states the right to get involved in negotiating a gaming compact because of the obvious state interest in gaming casino operations within the state boundaries, but does not compel it." Cheyenne River, 830 F.Supp. at 526. The IGRA provides several alternatives when an action is brought by an Indian tribe against a state. First, the state and tribe can continue to negotiate until a compact is agreed upon. Second, the state and tribe can negotiate, but fail to agree on a compact in which case the court must determine whether the state has negotiated in good faith and the action is either dismissed or stayed for additional negotiations. Third, if a state refuses to negotiate at all, the court can require that a compact be concluded within 60 days and if not, a mediator will select the tribe's proposed compact if it complies with applicable federal law. Therefore, we hold the IGRA does not force states to compact with Indian tribes regarding Indian gaming and does not violate the tenth amendment. See New York v. United States, --- U.S. ----, ---- - ----, 112 S.Ct. 2408, 2418-19, 120 L.Ed.2d 120 (1992); South Dakota v. Dole, 483 U.S. 203, 210-11, 107 S.Ct. 2793, 2797-98, 97 L.Ed.2d 171 (1987).
 
 
 37
 Accordingly, the order of the district court denying summary judgment and denying preliminary injunctive relief is affirmed. The cross-appeal is denied.
 
 
 
 [1]
 Honorable John B. Jones, Chief Judge, United States District Court for the District of South Dakota
 
 
 [2]
 Banking card games are those where players play against the house and the house acts as banker, e.g. blackjack. Non-banking card games are those games where players play against each other rather than against the house, e.g. poker
 
 
 [3]
 Tribes located in South Dakota include the Flandreau Santee Sioux Tribe, Yankton Sioux Tribe, Sisseton-Wahpeton Sioux Tribe, Crow Creek Sioux Tribe, Lower Brule Sioux Tribe, Standing Rock Sioux Tribe, Oglala Sioux Tribe, Rosebud Sioux Tribe, and Cheyenne River Sioux Tribe
 
 
 [4]
 The Flandreau compact was entered into by the state and the Flandreau Santee Sioux Tribe to allow that tribe to open a casino at Flandreau, South Dakota, in 1991. The Flandreau compact is summarized as follows:
 A. The Tribe is allowed initially to operate 180 gaming devices to be split at the Tribe's choice between slot machines, poker tables and blackjack tables.
 B. If the Tribe can demonstrate that their devices average at least $63.75 per day of play, then they are entitled to add an additional 70 devices, bringing the total to 250 devices.
 C. The blackjack and poker games and the slot machines are to be operated in accordance with state regulations covering pot and bet limits, payout limits and hours of operation.
 D. The State conducts background investigations for all potential tribal gaming operators. These persons must meet state licensing requirements. An arbitrations procedure may be invoked to handle licensing disputes.
 E. The Flandreau Tribal Gaming Commission handles discipline of licensees. However, there is oversight by the executive director of the State Gaming Commission. The executive director has the ability to require the Tribal Gaming Commission to impose greater penalties in discipline situations if he/she believes that the penalties imposed by the Tribe are not severe enough.
 F. If state bet limits are increased or decreased, the Tribe's bet limits are increased or decreased automatically.
 G. If the State authorizes new or different games, the Tribe is entitled upon amendment of the compact to offer such games.
 H. The 180 gaming devices authorized by the compact is based upon twice the number that one individual can control in Deadwood. If the maximum gaming device numbers for individuals in Deadwood is increased or decreased, then the Flandreau Tribe is entitled automatically to a proportional increase or decrease in authorized device numbers.
 I. The compact also deals with civil and criminal jurisdiction related to gaming. The jurisdiction is basically agreed to be as follows:
 Tribal member criminal defendants will be proceeded against in federal or tribal court. All others will be proceeded against in state court except consistent with State v. Larson, 455 N.W.2d 600 (S.D.1990). Civilly, disputes between tribal members will be heard in tribal court. If either party to the dispute is not a tribal member, the case will be heard in state court unless the parties stipulate the case to be heard in tribal court. Tribal sovereign immunity is not waived.
 
 
 [5]
 Fort Pierre, South Dakota is located in the center of the state, near the state capital, Pierre. Pluma, South Dakota is located in the Black Hills area in western South Dakota near Deadwood
 
 
 [6]
 Poarch Band of Creek Indians v. Alabama, 776 F.Supp. 550, 554-63 (S.D.Ala.1991), held that the eleventh amendment applies to actions by Indian tribes against the states, that Congress had not abrogated the state's eleventh amendment immunity by enacting the IGRA, the state had not consented to such suit, and that a suit against state officials was in fact a suit against the state and thus not excepted by the Ex parte Young doctrine
 
 
 [7]
 Ponca Tribe v. Oklahoma, No. CIV 92-988-T (W.D.Okla. Sept. 8, 1992); Sault Ste. Marie Tribe of Chippewa Indians v. Michigan, 800 F.Supp. 1484 (W.D.Mich.1992)