ATTORNEY GENERAL OF TEXAS

GREG ABBOTT

December 8, 2004

The Honorable Frank J. Corte Jr.
Chair, Committee on Defense Affairs and
    State-Federal Relations
Texas House of Representatives
Post Office Box 2910
Austin, Texas 78768-2910

Opinion No. GA-0278

Re: Whether constitutional authorization of video
lottery terminals on Indian tribal lands would
permit Indian tribes to offer casino gambling in
Texas (RQ-0214-GA)

Dear Representative Corte:

You request an opinion on questions related to House Joint Resolution 1 of the Seventy-eighth Legislature, Fourth Called Session.[1] *See* Tex. H.R.J. Res. 1, 78th Leg., 4th C.S. (2004). This resolution proposed amending Texas Constitution article III, section 47 to authorize the state to operate video lottery terminals ("VLTs") at racetracks and on Indian lands. "VLTs are electronic games of chance played on video terminals." HOUSE RESEARCH ORGANIZATION, FOCUS REPORT, BETTING ON VIDEO LOTTERY TERMINALS TO RAISE REVENUE 2 (Mar. 5, 2004).[2] Visually and internally they are similar to slot machines. *See id.* "Most VLTs are video-based, overseen by state lottery agencies, and can be monitored, controlled, and audited by a central computer system[.]" *Id.* "Some VLT games are purely games of chance, while others are video versions of card games such as poker and blackjack." *Id. See also* Tex. Att'y Gen. Op. No. GA-0103 (2003) at 2 (defining VLTs).

Article III, section 47 of the Texas Constitution prohibits lotteries except for those specifically excepted by section 47(e). *See id.* at 8; *see also* TEX. CONST. art. III, § 47. Thus, a constitutional amendment would be necessary to legalize VLTs in Texas. *See* Tex. Att'y Gen. Op. No. GA-0103 (2003) at 8. The legislature did not approve the proposed constitutional amendment that would have placed on the ballot a proposition to authorize video lottery terminals. *See* Tex. H.R.J. Res. 1, 78th Leg., 4th C.S. (2004); H.J. OF TEX., 78th Leg., 4th C.S. 218 (2004).[3] Nor did the legislature approve legislation that would have implemented the proposed constitutional amendment.

---

[1]Letter from Honorable Frank J. Corte Jr., Chair, Committee on Defense Affairs and State-Federal Relations, Texas House of Representatives, to Honorable Greg Abbott, Texas Attorney General (Apr. 27, 2004) (on file with Opinion Committee, *also available at* http://www.oag.state.tx.us) [hereinafter Request Letter].

[2]*Available at* http://www.capitol.state.tx.us/hrofr/frame4.htm#foc.

[3]House Joint Resolution 1 failed of adoption on the House floor.

*See* Tex. H.B. 1, 78th Leg., 4th C.S. (2004); H.J. OF TEX., 78th Leg., 4th C.S. 193 (2004); S.J. OF TEX., 78th Leg., 4th C.S. 58 (2004).[4]

## I.    Questions

You ask about the effect a constitutional amendment authorizing the state to operate VLTs at racetracks and on Indian lands would have on the following groups of Indian tribes:

> The Texas Band of Oklahoma Kickapoos, who were recognized by the federal government in Public Law 97-429, 25 U.S.C. § 1300b-11, without any reference to the tribe's right to offer gaming.[5]

> The other two recognized tribes in Texas - the Alabama-Coushatta Tribes of Texas and the Ysleta del Sur Pueblo (also known as the Tigua Indian tribe) - which were recognized under the Ysleta del Sur Pueblo and Alabama-Coushatta Tribes of Texas Restoration Act in 1987, 25 U.S.C. § 1300g-1; that legislation specifically states that "[a]ll gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on the lands of the tribe." 25 U.S.C. §[§] 737(a)[, 1300g-6.]

> Other Indian tribes not currently resident in Texas but with a historical relationship to Texas lands, such as the Comanche, the Kiowa, the Mescalero Apaches, and the Cherokees.

> Indian tribes in Texas that have not been recognized officially [by the federal government], but may be recognized in the future.

*See* Request Letter, *supra* note 1, at 1-2 (footnote added).

Your questions are summarized as follows: (1) may the state "authorize VLT gaming on tribal lands outside the jurisdiction of the federal Indian Gaming Regulatory Act;" (2) if a constitutional amendment and enabling legislation authorize VLTs on Indian reservations, will the Indian Gaming Regulatory Act "authorize Texas tribes to conduct all forms of casino-style gaming;" and (3) does the Indian Gaming Regulatory Act bar the state from "receiving a share of the revenues from VLTs . . . without a grant of territorial exclusivity or other unique benefit to the tribe?" *See id.* at 2. In addressing your questions, which raise issues of federal law, we rely on the relevant federal statutes and judicial decisions.

---

[4]House Bill 1 passed to engrossment on the House floor and was referred to the Senate Committee of the Whole, but failed to progress beyond a public hearing scheduled for May 14, 2004, before the Senate Committee of the Whole.

[5]For purposes of this opinion, "gambling" is synonymous with "gaming." *See Ellis v. State,* 162 S.W.2d 407, 408 (Tex. Crim. App. 1942) ("to bet or wager means to gamble or game for money or other stakes").

## II.    VLT Legislation, Seventy-eighth Legislature, Fourth Called Session

House Joint Resolution 1 proposed the following addition to article III, section 47:

> (f) The Legislature by general law may authorize the State to operate video lottery games and to contract with one or more of the following legal entities to operate video lottery games on behalf of the State:

>> (1) a person licensed in this State to conduct wagering on a horse race or greyhound race; or

>> (2) an Indian tribe *recognized by the United States government* under federal law.

TEX. H.R.J. RES. 1, § 1(f),78th Leg., 4th C.S. (2004) (as introduced) (emphasis added).

The Secretary of the Interior (the "Secretary") is required to publish a list of federally recognized tribes in the Federal Register. *See* 25 U.S.C. § 479a-1(a) (2000). The most recent list includes the Alabama-Coushatta Tribes[6] of Texas, the Kickapoo Traditional Tribe of Texas, and the Ysleta del Sur Pueblo of Texas.[7] *See* 68 Fed. Reg. 68180-84 (Dec. 5, 2003). The Secretary has also adopted procedures whereby an American Indian group may seek federal recognition as an Indian tribe. *See* 25 C.F.R. pt. 83 (2004).

The Committee Substitute to House Joint Resolution 1 expressly identified the three federally recognized Texas Indian tribes, providing that the legislature might "allow only the following legal entities to operate video lottery games on behalf of the State":

> (A) a person licensed in this State on May 1, 2004, to conduct wagering on a horse race or greyhound race . . . ;

> (B) the Ysleta del Sur Pueblo and Alabama-Coushatta Indian tribes, which, under an agreement with this State in the form prescribed by general law or negotiated by the governor and ratified by the Legislature, operate the games on lands held in trust by the United States for such tribes on May 1, 2004 . . . ; and

> (C) the Kickapoo Traditional Tribe of Texas, which, under an agreement with this State in the form prescribed by general law or

---

[6]Under federal law, the Alabama and Coushatta Indian Tribes of Texas are considered as one tribal unit, and we will refer to them at times as the Alabama-Coushatta Tribe. *See* 25 U.S.C. § 732 (2000).

[7]Ysleta del Sur Pueblo is also known as Tigua. *See* HOUSE RESEARCH ORGANIZATION, FOCUS REPORT, BETTING ON VIDEO LOTTERY TERMINALS TO RAISE REVENUE 6 (Mar. 5, 2004), *available at* http://www.capitol.state.tx.us/hrofr /frame4.htm#foc.

> negotiated by the governor and ratified by the Legislature, operates
> the games on lands held in trust by the United States for the benefit
> of the tribe on which Class III gaming is permitted under the Indian
> Gaming Regulatory Act of 1988 . . . .

Tex. Comm. Substitute H.R.J. Res. 1, § 1(f)(4)(A)-(C), 78th Leg., 4th C.S. (2004); *see also* H.J. OF TEX., 78th Leg., 4th C.S., 8, 29 (2004). The Committee Substitute also required the law authorizing the video lottery system to provide that "net revenue generated from video lottery terminals operated by an Indian tribe on Indian lands shall be distributed as set forth in the agreement authorizing the tribe to operate video lottery games, provided that the State must receive not less than 25 percent of the net revenue." Tex. Comm. Substitute H.R.J. Res. 1, § 1(f)(9)(b), 78th Leg., 4th C.S. (2004).

## III.    The Indian Gaming Regulatory Act

In 1988, Congress adopted the Indian Gaming Regulatory Act ("IGRA" or "Act"), 25 U.S.C. §§ 2701-21 (2000), in response to state concerns about the United States Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987). *See* S. REP. No. 100-446 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071-72. *Cabazon* considered whether gaming on an Indian reservation was subject to state regulation pursuant to Public Law 53-280,[8] a federal law granting California broad criminal jurisdiction over offenses committed by or against Indians within Indian lands in the state. *See Cabazon*, 480 U.S. at 207-08; 18 U.S.C. § 1162 (2000); *see also* 28 U.S.C. § 1360 (2000) (civil jurisdiction). The Supreme Court held that if the intent of a state law is to prohibit certain conduct, it falls within Public Law 280's grant of criminal jurisdiction to the state, but if the state law generally permits the conduct at issue, subject to regulation, it is a civil/regulatory law and the state is not authorized to enforce it on an Indian reservation. *See Cabazon*, 480 U.S. at 209. "The shorthand test is whether the conduct at issue violates the State's public policy." *Id.* The court in *Cabazon* held that Indian tribes in states that otherwise allow gaming have a right to conduct gaming activities on Indian lands, unimpeded by state regulation. *See id.* at 221-22.

IGRA permits federally recognized Indian tribes to conduct gaming activities under stated circumstances and creates the National Indian Gaming Commission to regulate such activity. *See* 25 U.S.C. §§ 2704-2710 (2000). The Act establishes three classes of gaming subject to differing degrees of federal, state, and tribal regulation. *See id.* § 2710. Class I gaming is limited to social games, either ceremonial or for nominal prizes, and is free of all but tribal regulation. *See id.* §§ 2703(6), 2710(a)(1). Class II gaming includes bingo and related games, *i.e.*, games played against other players in which the house has no economic interest in the outcome. *See id.* § 2703(7). It does not include "electronic or electromechanical facsimiles of any game of chance or slot machines of any kind." *Id.* § 2703(7)(B)(ii). A tribe may engage in Class II gaming if the state in which the tribe is located "permits such gaming for any purpose by any person, organization or entity (and such gaming is not otherwise specifically prohibited on Indian lands by Federal law)." *Id.* § 2710(b)(1)(A). Class II games are free of state regulation but are subject to tribal regulation and some federal oversight by the National Indian Gaming Commission. *See id.* § 2710(b)-(c).

---

[8]*See* Pub. L. No. 53-280, 67 Stat. 588 (codified at 18 U.S.C. 1162 and 28 U.S.C. 1360).

Class III gaming includes all other forms of gaming, *see id.* § 2703(8), in particular, the "lucrative casino-style games such as blackjack, slot machines, roulette, and baccarat." *Ysleta del Sur Pueblo v. Texas*, 36 F.3d 1325, 1331 (5th Cir. 1994), *cert. denied*, 514 U.S. 1016 (1995). Class III gaming thus includes VLTs. *See* 25 U.S.C. § 2710(d)(1)(A) (2000). A tribe may engage in Class III gaming if the state in which it is located "permits such gaming for any purpose by any person, organization, or entity." *Id.* § 2710(d)(1)(B). Class III gaming must also be authorized by tribal ordinance and must be "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect." *Id.* § 2710(d)(1)(C); *see id.* § 2710(d)(3) (negotiation and terms of tribal-state compact). The compact must be submitted to the Secretary of the Interior, who has 45 days in which to (1) approve the compact, (2) disapprove the compact, or (3) take no action, in which case the compact is deemed approved, but only to the extent it is consistent with the provisions of IGRA. *See id.* § 2710(d)(8). IGRA includes a provision authorizing a tribe to sue a state in federal court if the state refuses to negotiate a compact with the tribe, *see id.* § 2710(d)(7)(A)(i), but the Supreme Court has held this provision to be unconstitutional for violating the Eleventh Amendment of the United States Constitution. *See Seminole Tribe v. Florida*, 517 U.S. 44, 72-76 (1996).

## IV.    Whether the State May Authorize VLT Gaming on Tribal Lands Outside the Jurisdiction of IGRA

### A.    Lands Belonging to the Alabama-Coushatta or Ysleta del Sur Pueblo Tribe

You first ask whether the state may authorize VLT gaming on tribal lands outside the jurisdiction of the federal Indian Gaming Regulatory Act. The Kickapoo Traditional Tribe of Texas is subject to IGRA. *See* NATIONAL INDIAN GAMING COMMISSION, GAMING TRIBES.[9] *See generally Diamond Game Enters., Inc. v. Reno*, 230 F.3d 365 (D.C. Cir. 2000) (Kickapoo Traditional Tribe of Texas requested National Indian Gaming Commission to classify mechanical device as Class II aid). Thus, this question does not relate to gaming on Kickapoo tribal lands in Texas, but it does relate to gaming on Alabama-Coushatta and Ysleta del Sur Pueblo tribal lands.

#### 1.    Restoration Act

Gaming on Alabama-Coushatta and Ysleta del Sur Pueblo tribal lands is not governed by IGRA, but by another federal statute, the Ysleta del Sur Pueblo and Alabama and Coushatta Indian Tribes of Texas Restoration Act,[10] ("the Restoration Act"), which restored federal recognition to these two tribes. *See* 25 U.S.C. §§ 731-737 (2000) (restoring federal supervision to Alabama-Coushatta tribe); *id.* §§ 1300g-1300g-7 (restoring federal supervision to Ysleta del Sur Pueblo); *see also Ysleta del Sur Pueblo*, 36 F.3d at 1334-35 (addressing gaming on Ysleta del Sur Pueblo tribal lands). Section 737, which applies to the Alabama-Coushatta tribe, states as follows:

---

[9]*Available at* http://www.nigc.gov/nigc/nigcControl?option=GAMING_TRIBES&REGIONID=0&SORT=1.

[10]*See* Ysleta del Sur Pueblo and Alabama and Coushatta Indian Tribes of Texas Restoration Act, Pub. L. No. 100-89, 101 Stat. 666 (1987) (codified at 25 U.S.C. §§ 1300g-1300g-7 and 25 U.S.C. §§ 731-737).

(a)  In general

All gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on lands of the tribe.  Any violation of the prohibition provided in this subsection shall be subject to the same civil and criminal penalties that are provided by the laws of the State of Texas.  The provisions of this subsection are enacted in accordance with the tribe's request in Tribal Resolution No. T.C.-86-07 which was approved and certified on March 10, 1986.

(b)  No State regulatory jurisdiction

Nothing in this section shall be construed as a grant of civil or criminal regulatory jurisdiction to the State of Texas.

(c)  . . . the courts of the United States shall have exclusive jurisdiction over any offense in violation of subsection (a) of this section that is committed by the tribe, or by any member of the tribe, on the reservation or on lands of the tribe. . . .

25 U.S.C. § 737 (2000).  Identical provisions apply to the Ysleta del Sur Pueblo. *See id.* § 1300g-6.

The Fifth Circuit in *Ysleta del Sur Pueblo*, after reviewing the Restoration Act and its legislative history, concluded that the Restoration Act's specific provisions on gaming applicable to the Ysleta del Sur Pueblo prevailed over IGRA and governed gaming on that tribe's lands.  *See Ysleta del Sur Pueblo*, 36 F.3d at 1329, n.3, 1332.  Thus, the Restoration Act, and not IGRA, "would govern the determination of whether gaming activities proposed by the Ysleta del Sur Pueblo are allowed under Texas law, which functions as surrogate federal law." *Id.* at 1335.

The federal district court in *Alabama-Coushatta Tribes v. Texas*, 208 F. Supp. 2d 670 (E.D. Tex. 2002), relying on the Fifth Circuit decision in *Ysleta del Sur Pueblo*, held that the Restoration Act provisions on gaming also govern gaming on Alabama-Coushatta tribal lands.  *See Alabama-Coushatta Tribes*, 208 F. Supp. 2d at 674, 681 (25 U.S.C. § 731-37 governs gaming on Alabama-Coushatta tribal lands).  The Alabama-Coushatta and the Ysleta del Sur Pueblo tribes are subject to Texas law governing gaming just as other citizens or entities located in Texas.  *See generally Texas v. Ysleta del Sur Pueblo*, 220 F. Supp. 2d 668, 688-91 (W.D. Tex. 2001), *aff'd* 69 Fed. Appx. 659, 2003 WL 21356043 (5th Cir.), *cert. denied*, 124 S.Ct. 497 (2003).

## 2.    Johnson Act

The federal Gambling Devices Act, 15 U.S.C. §§ 1171-1178 (2000), commonly known as the Johnson Act, is also relevant to the Alabama-Coushatta and Ysleta del Sur Pueblo tribes.  These two tribes are subject to the following provision of the Johnson Act:

> It shall be unlawful to manufacture, recondition, repair, sell, transport, possess, or use any gambling device . . . within Indian country as defined in section 1151 of Title 18 . . . .

*Id.* § 1175(a). "Indian country" means "(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States . . . , and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same." 18 U.S.C. § 1151 (2000).

The Johnson Act defines "gambling device" as follows:

> (1)  any so-called "slot machine" or any other machine or mechanical device an essential part of which is a drum or reel with insignia thereon, and (A) which when operated may deliver, as the result of the application of an element of chance, any money or property, or (B) by the operation of which a person may become entitled to receive, as the result of the application of an element of chance, any money or property; or

> (2)  any other machine or mechanical device (including, but not limited to, roulette wheels and similar devices) designed and manufactured primarily for use in connection with gambling, and (A) which when operated may deliver, as the result of the application of an element of chance, any money or property, or (B) by the operation of which a person may become entitled to receive, as the result of the application of an element of chance, any money or property.

15 U.S.C. § 1171(a)(1)-(2) (2000).  Video lottery terminals are gambling devices within this definition. *See Citizen Band Potawatomi Indian Tribe v. Green*, 995 F.2d 179, 180-81 (10th Cir. 1993).

IGRA includes the following partial exemption from the Johnson Act:

> The provisions of section 1175 of Title 15 shall not apply to any gaming conducted under a Tribal-State compact that–

> (A)  is entered into under paragraph (3) [relating to Tribal-State compact] by a State in which gambling devices are legal, and

> (B)  is in effect.

25 U.S.C. § 2710(d)(6) (2000). *See Citizen Band Potawatomi Indian Tribe*, 995 F.2d at 181 (IGRA for limited waiver of Johnson Act liability under certain circumstances).  The Alabama-Coushatta and Ysleta del Sur Pueblo tribes are subject to the Restoration Act and not IGRA.  Because the

Restoration Act does not explicitly exempt these two tribes from the Johnson Act, it appears they may not possess or use VLTs on their lands.[11]

## B.    Lands Belonging to Other Groups of Indians

You also ask whether the state may authorize VLT gaming on tribal lands belonging to Indian tribes "not currently resident in Texas but with a historical relationship to Texas lands"[12] or "Indian tribes in Texas that have not been recognized . . . [by the federal government] but may be recognized in the future." Request Letter, *supra* note 1, at 2. Of course, Texas may not authorize VLT gaming on any such lands that are subject to the Johnson Act.

Any legislation singling out such groups of Indians for special treatment would raise issues under the Equal Protection Clause of the United States Constitution. *See* U.S. CONST. amend. XIV, § 1; *see also Washington v. Confederated Bands and Tribes of the Yakima Indian Nation*, 439 U.S. 463, 500-01 (1979); *Am. Greyhound Racing, Inc. v. Hull*, 146 F. Supp. 2d 1012, 1075-76 (D. Arizona 2001), *vacated on other grounds*, 305 F.3d 1015, 1018 (9th Cir. 2002). Pursuant to the Equal Protection Clause, racial classifications are given strict scrutiny by a reviewing court and are constitutional only if they are narrowly tailored to further compelling governmental interests. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995); *see also Rice v. Cayetano*, 528 U.S. 495, 517-24 (2000) (striking down a race-based voting limitation). Federal authority to enact legislation singling out tribal Indians for special treatment derives from the power of Congress to regulate commerce with Indian tribes, from the treaty power, and from the federal trusteeship over Indian lands established by federal statute. *See* U.S. CONST. art. I, § 8, cl. 3; art. II, § 2, cl. 2; 25 U.S.C. § 177 (2000). Thus, Indian tribes occupy a unique status that allows the federal government to enact legislation singling out tribal Indians even where the legislation "might otherwise be constitutionally offensive." *Confederated Bands and Tribes of the Yakima Indian Nation* 439 U.S. at 501. Federal laws "reasonably designed to further the cause of Indian self-government" and applicable only to members of a federally recognized tribe involve a political and not a racial classification and are subject to the rational basis test for equal protection. *See Morton v. Mancari*, 417 U.S. 535, 554 (1974).

States do not have a similar unique relationship with Indian tribes and may enact legislation according special treatment to Indian tribes only when authorized to do so by Congress. *See Confederated Bands and Tribes of the Yakima Indian Nation*, 439 U.S. at 500-01; *Peyote Way Church of God, Inc., v. Thornburgh*, 922 F.2d 1210, 1218 (5th Cir. 1991). We find no federal law authorizing Texas to adopt laws singling out groups of Indians "not currently resident in Texas but

---

[11]The Restoration Act is silent with respect to the process, procedure and oversight of any gaming activity that may be authorized by the State of Texas. Under the language of the Restoration Act and IGRA, federal policy and oversight provided for under IGRA that is not inconsistent with the Restoration Act applies to the tribes subject to the Restoration Act. It is not clear how a court might address this question and whether it might find the limited waiver of the Johnson Act liability found in IGRA applicable also to the Alabama-Coushatta and Ysleta del Sur Pueblo tribes.

[12]We assume that such tribes own land in Texas that might be affected by Texas law, even though they are not federally recognized in Texas.

with a historical relationship to Texas lands" or "Indian tribes in Texas that have not been recognized . . . [by the federal government] but may be recognized in the future." Request Letter, *supra* note 1, at 2. Texas may authorize such groups of Indians to engage in VLT gaming in the state to the same extent it authorizes any other person or group to conduct such gaming. *But see* 15 U.S.C. §§ 1171-1178 (Johnson Act).

### V.     Whether Legalization of VLTs on Indian Reservation Also Legalizes Other Casino Games on Reservation

You raise the following question: if Texas permits one kind of Class III gaming activity, are all Class III gaming activities lawful on Indian lands or only the specific type of Class III gaming permitted by the state? *See id.* Federal appellate courts have reached different conclusions on this question. *See Rumsey Indian Rancheria of Wintun Indians v. Wilson*, 64 F.3d 1250, 1256 (9th Cir. 1994), *amended by* 99 F.3d 321 (9th Cir. 1996) (state need only allow Indian tribes to operate games that others can operate); *accord Cheyenne River Sioux Tribe v. South Dakota*, 3 F.3d 273, 279 (8th Cir. 1993). *See also Mashantucket Pequot Tribe v. Connecticut*, 913 F.2d 1024, 1029-1031 (2d Cir. 1990), *cert. denied*, 499 U.S. 975 (1991) (where state permits some Class III games in a highly regulated form, it must negotiate under IGRA for casino-type games of chance); *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Wisconsin*, 770 F. Supp. 480, 487-88 (W.D. Wis. 1991), *appeal dismissed for w.o.j.*, 957 F.2d 515 (7th Cir.1992) (where state was authorized to operate any kind of lottery, it had to negotiate with Indian tribe over including in tribal-state compact any casino-type game).

Some judicial decisions on this question rely on the following IGRA provision:

> (1) Class III gaming activities shall be lawful on Indian lands only if such activities are—
>
> . . . .
>
> (B) located in a State that permits *such gaming* for any purpose by any person, organization, or entity . . . .

25 U.S.C. § 2710(d)(1)(B) (2000) (emphasis added). The court in *Cheyenne River Sioux Tribe* determined that "[t]he 'such gaming' language of . . . 25 U.S.C. [§] 2710(d)(1)(B) does not require the state to negotiate with respect to forms of [class III] gaming it does not presently permit." *Cheyenne River Sioux Tribe*, 3 F.3d at 279; *accord Dalton v. Pataki*, 780 N.Y.S.2d 47, 59-60 (N.Y.A.D. 2004).

Some courts have held that IGRA incorporates the holding of *Cabazon* that if state law generally permits gaming, subject to regulation, the state is not authorized to enforce its law on an Indian reservation. *See Cabazon*, 480 U.S. at 221-22; *see also Mashantucket Pequot Tribe*, 913 F.2d at 1031 (*Cabazon* analysis applicable to Class III gaming). "Applying the *Cabazon* analysis to IGRA essentially requires states to negotiate over all [Class III] games that are not specifically prohibited by criminal law or public policy, rather than the narrower class of games that the state expressly

authorizes." Amy Head, *The Death of the New Buffalo: The Fifth Circuit Slays Indian Gaming in Texas*, 34 TEX. TECH. L. REV. 377, 392 (2003).

In *Ysleta del Sur Pueblo v. Texas*, 852 F. Supp. 587 (W.D. Texas 1993), *rev'd*, 36 F.3d 1325 (5th Cir. 1994), the Ysleta del Sur Pueblo tribe sought to negotiate with the Texas governor under IGRA for a compact allowing it to conduct various Class III gaming activities on its tribal land. The state maintained that only those Class III gaming activities expressly allowed in Texas could be the subject of negotiations with an Indian tribe. *See Ysleta del Sur Pueblo v. Texas*, 852 F. Supp. at 593-94. The trial court determined that IGRA applied to the Ysleta del Sur Pueblo and construed that statute to incorporate the *Cabazon* analysis for determining the scope of Class III gaming. *See id.* at 591, 595-96. It found that Texas law permitted some persons to engage in casino gaming under the "carnival exception" in Penal Code section 47.01. *See id.* at 595. Section 47.01(1), which defines the term "bet" for purposes of the chapter 47 prohibitions against gambling, provides that a bet does not include:

> an offer of merchandise, with a value not greater than $25, made by the proprietor of a bona fide carnival contest conducted at a carnival sponsored by a nonprofit religious, fraternal, school, law enforcement, youth, agricultural, or civic group, including any nonprofit agricultural or civic group incorporated by the state before 1955, if the person to receive the merchandise from the proprietor is the person who performs the carnival contest.

TEX. PEN. CODE. ANN. § 47.01(1)(C) (Vernon 2003). Because the "carnival exception" permitted some persons to engage in casino gaming, the state was required to negotiate with the tribe about the Class III casino games requested by the tribe. *Ysleta del Sur Pueblo v. Texas*, 852 F. Supp. at 595-96 (also relying on definition of "lottery" in Texas Lottery Act). The trial court opinion in *Ysleta del Sur Pueblo v. Texas* thus determined that a federally recognized tribe in Texas may negotiate with the state about conducting all Class III games.

As we have noted, the Fifth Circuit disagreed and determined that the Restoration Act, and not IGRA, applied to the Ysleta del Sur Pueblo. *See Ysleta del Sur Pueblo*, 36 F.3d at 1327. This court expressly left open the question whether IGRA incorporates *Cabazon* with regard to Class III gaming. *See id.* at 1333, n.17. While the Fifth Circuit determined that the Eleventh Amendment barred the tribe's action against the state under the Restoration Act, remanding the case with directions to dismiss the tribe's suit, *see id.* at 1332, 1335, the court in *Alabama-Coushatta Tribes v. Texas*, 208 F. Supp. 2d 670 (E.D. Tex. 2002), rejected the argument that all other holdings in the Fifth Circuit case were dicta. *See Alabama-Coushatta Tribes v. Texas*, 208 F. Supp. 2d at 674-75 (citing *Florida Cent. R. Co. v. Schutte*, 103 U.S. 118, 143 (1880), and *Nardone v. Reynolds*, 538 F.2d 1131, 1135 n.11 (5th Cir.1976)). In summary, the Fifth Circuit determined that the Restoration Act did not incorporate the *Cabazon* test, *see Ysleta del Sur Pueblo*, 36 F.3d at 1333-34, but it did not construe IGRA.

The question before us involves an interpretation of IGRA, a federal statute. Neither the United States Supreme Court nor the Fifth Circuit has decided the scope of Class III gaming for

recognized Indian tribes in states that permit only limited kinds of Class III gaming activities, while other federal courts of appeals have reached different decisions on this question. Under these circumstances, we conclude that this question is an open question of federal law in this state, and as such, cannot be given a definitive answer in an attorney general opinion. *See United States v. Gomez*, 911 F.2d 219, 221 n.2 (9th Cir. 1990) (giving no special weight to Idaho Attorney General Opinion construing federal law).[13] The Kickapoo Traditional Tribe of Texas is at present the only Texas tribe to which IGRA applies. Thus, it is the only Texas Indian tribe that may negotiate with the state about conducting Class III games. If any other Texas Indian tribes become subject to IGRA through federal recognition or congressional enactment, those tribes will also be able to negotiate about conducting Class III games, and the scope of their permissible gaming activity will depend on the judicial construction of IGRA provisions authorizing Class III gaming.

## VI.    Whether IGRA Bars the State from Receiving a Share of the Revenues from VLTs on Indian Reservations

You ask whether IGRA bars the state from receiving a share of the revenues from VLTs without a grant of territorial exclusivity or another unique benefit to the tribe.

IGRA provides that a tribal-state compact for Class III gaming may include provisions relating to "the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity." 25 U.S.C. § 2710(d)(3)(C)(iii) (2000). IGRA further provides as follows:

> Except for any assessments that may be agreed to under paragraph (3)(C)(iii) of this subsection, nothing in this section shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity. No State may refuse to enter into the negotiations described in paragraph (3)(A) based upon the lack of authority in such State, or its political subdivisions, to impose such a tax, fee, charge, or other assessment.

*Id.* § 2710(d)(4).

IGRA does not expressly provide that a tribal-state compact for Class III gaming may include provisions for sharing gaming revenues with the state. The Interior Department has, however, approved revenue-sharing provisions in some tribal-state compacts negotiated under IGRA. *See Oversight Hearing On the Indian Gaming Regulatory Act of 1988 before the Senate Comm.*

---

[13]Opinions of a state attorney general on state law questions are entitled to careful consideration by federal courts and are generally regarded as highly persuasive. *See Harris County Comm'rs Ct. v. Moore*, 420 U.S. 77, 87 n.10 (1975).

*on Indian Affairs*, 108th Cong. (2003) (statement of Aurene M. Martin, Acting Assistant Secretary–Indian Affairs, Dept. of the Interior).[14]  The Interior Department stated its position to a Senate Committee in July 2003 as follows:

> To date, the Department has only approved revenue-sharing payments that call for tribal payments when the state has agreed to provide [a] valuable economic benefit of what the Department has termed "substantial exclusivity" for Indian gaming in exchange for the payment.   As a consequence, if the Department affirmatively approves a proposed compact, it has an obligation to ensure that the benefit received by the state under the proposed compact is appropriate in light of the benefit conferred on the tribe. Accordingly, if a payment exceeds the benefit received by the tribe, it would violate IGRA because it would amount to an unlawful tax, fee, charge, or assessment. While there has been substantial disagreement over what constitutes a tax, fee, charge, or assessment within this context, we believe that if the payments are made in exchange for the grant of a valuable economic benefit that the governor has discretion to provide, these payments do not fall within the category of prohibited taxes, fees, charges, or other assessments.

*Id.*[15]

In answer to your question, the Interior Department will not approve a tribal-state compact allowing the state to receive a share of the revenues from VLTs without a grant of territorial exclusivity or another unique economic benefit to the tribe.

We point out that Senate Bill 1529, proposing amendments to IGRA, was introduced in the United States Senate in 2003. *See* Indian Gaming Regulatory Act Amendments of 2003, S. 1529, 108th Cong. (2003).  The proposed amendments include a provision governing the apportionment of revenues, which states that the Secretary may not approve a compact or other agreement that includes an apportionment of net revenues with a state unless the following conditions are met:

> (I) the total amount of net revenues [from gaming]
>
> > (aa) exceeds the amounts necessary to meet the requirements of [tribal government operations or programs and to provide for the general welfare of the Indian tribe and its members pursuant to 25

---

[14]*Available at* http://indian.senate.gov/2003hrgs/070903hrg/martin.PDF.

[15]*See also* Letter from Honorable Neal A. McCaleb, Assistant Secretary, Indian Affairs, Department of the Interior, to Honorable B. Cheryll Smith, Tribal Chief, Jena Band of Choctaw Indians, at 1-2 (Mar. 7, 2002) (on file with Opinion Committee) (disapproving tribal-state compact because it required payments of gaming revenues to state without a state grant of exclusivity rights or other quantifiable economic benefit to the tribe).

U.S.C. § 2710(b)(2)(B)(i) and (ii)[16] and to make apportionments pursuant to subsection (f)(4)(B)(ii) of S. 1529,][17] if applicable; and

(bb) [the apportionment] is in accordance with regulations promulgated by the Secretary under subparagraph (C); and

(II) a substantial economic benefit is rendered by the State to the Indian tribe.

*See id.* (footnote added) (proposing an amendment to 25 U.S.C. § 2710). Because your questions relate to IGRA, we advise you to monitor Senate Bill 1529 and other amendments to IGRA that Congress may propose as well as any judicial decisions on this statute.

---

[16]The cited provision pertains to apportionment of gaming revenues to the tribe. *See* 25 U.S.C. § 2710(b)(2)(B)(i)-(ii) (2000).

[17]The cited provision pertains to apportionment of gaming revenues in excess of those apportioned for tribal needs under a section of the proposed amendment allowing these excess revenues to be apportioned to local governments to the extent of actual costs incurred by affected local governments as a result of the gaming activities. *See* Indian Gaming Regulatory Act Amendments of 2003, S. 1529, 108th Cong. § 2(f)(2)(B)(ii) (2003).

## S U M M A R Y

The Restoration Act does not authorize the Alabama-Coushatta and the Ysleta del Sur Pueblo tribes to operate VLTs on tribal land.

Whether a federally recognized Texas Indian tribe may negotiate with Texas under the Indian Gaming Regulatory Act about only the specific Class III games allowed by Texas law, or whether it may negotiate about all Class III games is an open question in this state.

A tribal-state compact for Class III gaming activities under the IGRA may include provisions allowing state assessments of gaming activities as necessary to defer the costs of regulating the gaming activities. A compact may not allow the state to receive a share of Class III gaming revenues unless the compact grants territorial exclusivity or another unique economic benefit to the tribe.

Very truly yours,

GREG ABBOTT
Attorney General of Texas

BARRY R. MCBEE
First Assistant Attorney General

DON R. WILLETT
Deputy Attorney General for Legal Counsel

NANCY S. FULLER
Chair, Opinion Committee

Susan L. Garrison
Assistant Attorney General, Opinion Committee